JAMES STIMPSON, PLAINTIFF IN ERROR, v. THE WEST CHESTER RAIL-
ROAD COMPANY, DEFENDANTS.

The practice of excepting, generally, to a charge of the court to the jury, without
setting out, specifically, the points excepted to, censured. The writ of error not
dismissed, only on account of the peculiar circumstances of the case.

Where a defective patent had been surrendered, and a new one taken out, and the
patentee brought an action for a violation of his patent right, laying the infringe-
ment at a date subsequent to that of the renewed patent, proof of the use of the
thing patented during the interval between the original and renewed patents will
not defeat the action.

The seventh section of the act of March 3, 1839, has exclusive reference to an
original application for a patent, and not to a renewal of it.

An original patent being destroyed by the burning of the patent-office, and the
only record of the specifications being a publication in the Franklin Journal,
the claim is not limited by that publication, because the whole of the specifica-
tions are not set forth in it.

Whether a renewed patent, after a surrender of a defective one, is substantially for
a different invention, is a question for the jury, and not for the court.

As the thirteenth section of the act of 1836 provides for the renewal of a patent,
where it shall be " inoperative or invalid by reason of a defective or insufficient
description or specification," " if the error shall have arisen by inadvertence, ac-
cident, or mistake, and without any fraudulent or deceptive intention," the fact
of the granting of the renewed patent closes all inquiry into the existence of in-
advertence, accident, or mistake, and leaves open only the question of fraud for
the jury.

THIS case was brought up, by writ of error, from the Circuit
Court of the United States for East Pennslyvania.

It was a suit brought, in the Circuit Court, by Stimpson against
the Railroad Company, for a violation of his patent right.

On the 23d of August, 1831, Stimpson took out letters patent for
an improvement in the mode of turning short curves on railroads.
These letters were not given in evidence upon the trial, having
been burned in the conflagration of the patent-office, in December,
1836, and no copy could be found. Secondary evidence was
given of their contents by the following publication in the Franklin
Journal.

"For an improvement in the mode of turning short curves on rail-
roads, such as the corners of streets ; James Stimpson, city of
Baltimore, August 23.

" 37. The plan proposed is to make the extreme edges of the
flanches flat, and of greater width than ordinary, and to construct
the rails in such a manner that where a short turn is to be made,
the extreme edge of the flanch shall rest upon it, instead of upon
the tread of the wheel, thus increasing the effective diameter of the
wheel in a degree equal to twice the projection of the flanch. The
claim is made to ' the application of the flanches of railroad car-
riage-wheels to turn short curvatures upon railroads or tracks, par-
ticularly turning the corners of streets, wharves, crossing of tracks
or roads, and passing over turnabouts,' &c." Franklin Journal,
vol. 9, p. 124.

Stimpson *v.* West Chester Railroad Company.

On turning to pages 270 and 271, vol. 4, there will be found specifications of two patents granted to James Wright, of Columbia, Pennsylvania, for the mode of turning curves claimed by Mr. Stimpson. The only difference is, that Mr. Wright proposes to adapt his cars to several different curves by having three or more offsets in his wheels when necessary.

On the same day, namely, the 23d of August, 1831, Stimpson took out, also, letters patent for an improvement in the mode of forming and using cast or wrought-iron plates or rails, for railroad carriage-wheels to run upon. These letters being also destroyed, the following extract from the Franklin Journal was given in evidence.

Franklin Journal, vol. 9, p. 125. " 39. For an improvement in the mode of *forming and using cast or wrought-iron plates, or rails, for railroad carriage-wheels to run upon* ; James Stimpson, city of Baltimore, Maryland, August 23 (1831).

" The claim in this case is to ' the application of cast or wrought-iron plates for the use of railways on the streets or wharves of cities or elsewhere. The objects of said improvement being to employ rails that will not present any obstacles to the ordinary use of streets, or sustain injury therefrom, and so to form the plates at the intersections of streets or other crossings, that cars will readily pass over them, and also on circles of small radius.'

" The rails are to be formed with a groove in them to receive the flanches of the wheels ; on one side of the groove, the width is to be sufficient for the tread of the wheel, on the other, it need not exceed three quarters of an inch. These rails are to be laid flush with the pavement of the streets. At corners to be turned, the rails are to be cast, or made of the proper curvature, one of them only being provided with a groove, as the flanch is to run upon the other, upon the principle described in No. 37. Provision is to be made by scrapers, or brushes, preceding the carriages, to clear the grooves of dust, ice, and other obstructions."

In 1835, the first mentioned of these letters, namely, for an "improvement in the mode of turning short curves on railroads," were surrendered on account of a defective specification, and on the 26th of September, 1835, a renewed patent was issued for the term of fourteen years from the 23d of August, 1831. The schedule referred to in this patent was as follows.

" *Short Curves.*

" *23d August*, 1831. — *Renewed 26th September,* 1835.

" To all whom these presents shall come : Be it known, that I, James Stimpson, of the city and county of Baltimore and State of Maryland, have invented a new and useful improvement in the mode of turning short curves upon railroads with railroad carriages, particularly those round the corners of streets, wharves, &c., and

that the following is a full and exact description of said invention or improvement, as invented or improved by me, namely :— I use or apply the common peripheries of the flanches of the wheels for the aforesaid purpose, in the following manner : I lay a flat rail, which, however, may be grooved, if preferred, at the commencement of the curvation, and in a position to be centrally under the flanches of the wheels upon the outer track of the circle, so that no other part of the wheels which run upon the outer circle of the track rails shall touch or bear upon the rails, but the peripheries of the flanches ; they bearing the whole weight of the load and carriage, while the opposite wheels, which run upon the inner track of the circle, are to be run and bear upon their treads in the usual way, and their flanches run freely in a groove or channel ; which treads are ordinarily about three inches in diameter less than the peripheries of the flanches.

" Were the bearing surfaces of the wheels which are in contact with the rails while thus turning the curve to be connected by straight lines from every point, there would thus be formed the frustrums of two cones (if there be four wheels and two axles to the carriage), or if but one axle and two wheels then but one cone ; which frustrums, or the weels representing their extremities, will, if the wheels are thirty inches in diameter, and are coupled about three feet six inches apart, turn a curve of about sixty feet radius of the inner track rail. The difference in diameter between the flanches and treads before stated, the tracks of the usual width, and the wheels coupled as stated, would turn a curve of a somewhat smaller radius, if the axles were not confined to the carriage in a parallel position with each other ; but this being generally deemed necessary, the wheels run upon lines of tangents, and these upon the inner track being as wide apart in the coupling as the outer ones, keep constantly inclining the carriage outwards, and thus cause the carriage to tend to run upon a larger circle than the difference in diameter of the treads and flanches would otherwise give ; but the depth of the flanches and the couplings may be so varied as to turn any other radius of a circle desired.

" What I claim as my invention or improvement is the application of the flanches on the wheels on one side of railroad carriages, and of the treads of the wheels on the other side, to turn curves upon railways, particularly such as turning the corners of streets, wharves, &c., in cities and elsewhere, operating upon the principle herein set forth.

JAMES STIMPSON.

" Witnesses, — James H. Stimpson,
          George C. Penniman."

In October, 1840, Stimpson brought his action against the

West Chester Railroad Company for a violation of this renewed patent, and laid the infringement to have taken place in 1839.

In April, 1842, the case came on for trial.

The plaintiff produced his patent, and gave evidence that the defendants had used upon their road several curves of this description.

The defendants disputed the originality of the invention of the thing patented, under which head of defence much evidence was given; and also contended that the groove was not claimed in the first patent of 1831, and therefore was not included in the renewed patent of 1835. The evidence of Dr. Jones upon this last head being referred to by the court below, it is proper to insert that part of it.

"*Interrogatory fifth.* What are the contents of the specification of the alleged improvement of August 23, 1831? What are your means of knowing what were their contents? If you know them, are they dissimilar or similar to those of the plaintiff's specification of September 26, 1835, a copy of which, marked A, is hereto annexed? If dissimilar, state in what particulars, and whether they are as to matters of form and substance, and particularly describe the difference, if any. Answer fully."

" To the fifth interrogatory, I answer, that the plaintiff exhibited to me the specification in question, previously to his filing the same in the Patent Office; as he likewise did at the same time the specification of a patent for ' forming and using cast-iron plates or rails for railroad carriage-wheels to run upon,' which last patent is noticed on page 125, vol. 9, second series, of the Journal of the Franklin Institute. I then examined them cursorily, and expressed an opinion, that the improvements described in the two specifications might have been embraced in one, and that it would have been better to have pursued that course. The specification of the mode of turning short curves appeared to me incomplete; an essential feature of it being contained in that for ' forming and using cast-iron plates,' &c. The papers, however, remained as drawn up by Mr. Stimpson's legal adviser, and when the patents were subsequently surrendered in 1835, it was thought best to preserve the division into two; it was probably in fact necessary to pursue this course, as I am not aware of any precedent for uniting two patents into one, although one may be divided into two or more.

" Nearly ten years have elapsed since I first saw the specifications upon which these patents were first issued, and nearly six years since I last read them; and my recollection of them extends to certain prominent points only. The claim under the patent for turning short curves, as given in vol. 9, p. 124, of my Journal is, I have no doubt, literally correct. There has been an omission in the printing of inverted commas ["] after the word ' turnabout,' &c. In this specification it was proposed to make the extreme

edges of the flanches flat, and of greater width than ordinary ; this, however, did not enter into the claim, and it is not probable that I should have recollected the fact, had it not been noted in my Journal, or called up by some other collateral circumstance. The main defect, in my judgment, of the original specification, in the patent for turning short curves, was the omission of the mention of the groove in the inner rail. I believe, however, that it was alluded to in this specification, but the description of it was contained principally, if not wholly, in the specification of the patent for ' forming and using cast-iron on wrought plates,' &c., above noticed ; as may be inferred from a reference to my Journal, vol. 9, p. 125, patent 39.

" *Cross Interrogatories*. 1. Did you or did you not prepare the papers of the plaintiff when his patent for short curves was surrendered and renewed ? What was the object of such surrender and renewal ? Was it or was it not that the claim of running over or across tracks at right angles might not continue any longer to be incorporated in the same patent with the claim for short curves, as it had been theretofore ?

" To the first cross interrogatory, I answer, that I did prepare the papers of the plaintiff when his patent for turning short curves was surrendered for reissue ; that the object of such surrender and renewal was to limit and confine it to the turning short curves in streets, &c., by leaving out certain matters in it respecting the crossing of tracks or roads, and the passing over turnabouts ; and to define the subject-matter of the patent more clearly, without its being necessary to refer to that simultaneously obtained for ' forming and using cast or wrought-iron plates,' &c."

The bill of exceptions taken by the plaintiff was to the following part of the charge of the court to the jury, namely : —

" Having thus presented you with a view of the rules and principles of the common law applicable to the renewal of patents, as laid down by the Supreme Court, together with the provisions of the different acts of Congress on this subject, we will now state to you what is, in our opinion, their legal result.

" To authorize the surrender of an old patent and issue of a new one, consistently with the provisions of the original patent law of 1793, and the decisions of the Supreme Court, independently of any act of Congress conferring such power, there are these requisites indispensable to the power arising. (1.) The original patent must be inoperative or invalid for the causes set forth in the act of 1832, — the non-compliance with the third section of the act of 1793, for the want of a proper specification of the thing patented, through inadvertence, accident, or mistake, without any fraudulent or deceptive intention. This being the only case embraced in the law to which the authority conferred applies. (2.) 1, The defect in the specification, which makes it incompetent to secure the rights of the patentee, must have arisen from inadvertence, acci-

dent, or mistake, and 2, not from any fraud or misconduct. The reissue of the patent by the appropriate officer is presumptive evidence that the requisites of the law have been complied with, on the production of such evidence or proof otherwise as justified it ; but the question of the validity of the new patent is a judicial one, depending on the fact of inadvertence or fraud, as you shall find it ; and the opinion of the court on matters of law involved in the inquiry. 14 Peters, 458 ; 6 Peters, 243 ; 7 Peters, 321 ; Act of 1839 (5 Lit. & Brown's ed. 353). The reason why there must be an inquiry into both the inadvertence and fraud arises from the settled construction of the act of 1793, that where the defect is not owing to fraud, the defendant is entitled to a verdict and judgment in his favor, but not to a judgment that the patent is void for the defect, unless he shows that the defect was owing to fraud. 1 Bald. ; 6 Peters, 246. You must then be satisfied, affirmatively, that the defect of the patent arose from the inadvertence of the patentee, and negatively, that it did not arise from his fraud or misconduct, or, in the words of the acts of 1832 and 1836, ' without any fraudulent or deceptive intention.' The finding the fact of inadvertence may negative the fact of fraud, but in this, as in other cases, fraud may be inferred from gross inadvertence or negligence, such as may be the indication of a design to deceive the public. The defects in the old patent must be in the specification, when it does not comply with the requisites of the third section of the act of 1793, calling for a correct description of the thing patented (6 Peters, 247); a new one may be issued on compliance with those requisites, which are there prescribed. But the new patent must be confined to the thing patented by the old one, — the thing invented or discovered, — ' *the same invention*'; it cannot embrace another substantive and essential matter, which was not before patented ; the thing, the invention, must be the same in both patents ; the only object in the renewal being to cure a defect in the description, not to supply the omission of an essential part of the invention ; the new patent cannot be broader than the old one. If the thing patented is the same in both patents, its public use did not, under the former laws, amount to an abandonment, or such an acquiescence as to affect the new patent on the ground of delay or negligence in the assertion of the right of the patentee, from the date of the old patent to its reissue. But when an essential part is omitted, and the patentee suffers it to remain unpatented till it has come into public use, before the new patent issues, it will be subject to the same rules which apply to an original patent, making it incompetent to protect the patentee in his claim to such part in virtue of the patent reissued, if it was not described in the one surrendered. The thirteenth section of the act of 1836 authorizes a new improvement, invented since the first patent, to be added in a renewed

one ; no law gives any authority to add an improvement, which had been invented by the patentee before the original grant ; for it is not and cannot be any part of the description or specification of another distinct improvement. A patent for the combination of the parts of an old machine must show wherein such combination exists ; what parts compose it ; how they are combined in their action ; if the description is defective, it may be corrected by a new one ; the correction, however, must not extend beyond the combination of the parts first specified, as the introduction of other parts, not before specified, makes an entire new combination; consequently the thing patented becomes essentially different, being not the same invention, but a new one, made by a combination of a part not combined before, which might be a proper subject of an original patent, yet would not be authorized in a renewed one.

"These are the tests which the law applies to the description of the thing patented, in order to ascertain whether, in the words of the act of 1832, the old patent was ' invalid or inoperative ' by reason that the conditions of the former law not having been complied with, or, in the language of the. Supreme Court, the patent ' is found to be incompetent to secure the reward which the law intended to confer on the patentee for his invention.' In such case, the patent may be surrendered for reissue, in order to correct the defects which invalidated the first, but the law expressly makes the new patent ' in all respects liable to the same matter of objection and defence ' as the old one, and imposes on the patentee the obligation ' of compliance with the terms and conditions prescribed by the third section of the act of 1793.' This is done by showing, according to its requisitions, what was the invention, the thing patented, by a designation of the invention principally, made in fuller, clearer, and more exact terms than those used, so as to give it validity and effect, and secure the same invention, which is the only legitimate office of the renewed or reissued patent. A specification consists of two parts, — description and claim ; the descriptive part is the explanation of the improvement in all the particulars required by the law ; the claim or summary, at the close of the description or specification, is the declaration of the patentee of what he claims as his invention, by which he is bound, so that he can claim nothing which is not included in the summary, and could disclaim nothing which was included in it till the passage of the act of 1837. But the summary may be referred to the description, and both will be liberally construed to ascertain what was claimed, and if the words will admit of it, both parts will be connected in order to carry into effect the true intention of the patentee, as it may appear on a judicial inspection of the whole specification. This makes it a question of law what is the thing patented, depending not on the actual or supposed intention of the patentee, but the conclusion of the law

on the language he has used to express it ; a part of the description may be construed as a claim, and carried into the summary, and made a part of the thing patented, the effect of which is the same as if it was included in the summary in express terms. Cooper *v.* Matheys, C. C. MSS. To authorize a recovery for the violation of a patent right, the plaintiff must show that he is the inventer of every thing he claims as new, that it is embraced in the patent, and that every thing so claimed and patented has been infringed by the defendant ; thus, where the patent is for a particular combination of the parts of an old machine, and the defendant has not used the whole combination as specified in the description, and carried into the summary, the plaintiff cannot recover. Prouty et al. *v.* Ruggles, 16 Peters, 336."

The court then proceeded to state the substance of the plaintiff's declaration, and referred to the patent of 1835, and the specification thereto attached, in order to ascertain the thing patented by that patent which was stated therefrom ; they then inquired what was the thing patented in 1831, by referring to the evidence of Thomas P. Jones, contained in the deposition aforesaid, in connection with the Journal of the Franklin Institute referred to by him. The court, remarking that there being in evidence no copy of the patent of 1831, any drawing or specification of the thing patented, or other proof of the contents of either than was contained in the deposition and Journal aforesaid, then gave their opinion to the jury, that, on this evidence, the use of grooves was not claimed, and was no part of the thing patented in 1831 for turning short curves, but was a part of the thing patented in 1835. That it was an essential part of this invention, as Jones testified, and without which all the witnesses agreed that the invention was useless ; as without the groove the cars would run off the road, and that the patent was not for any parts of the machine which were new, but for a new combination of the old parts. It was then submitted to the jury, whether, on the evidence aforesaid, the omission of the groove in the patent of 1831 arose from inadvertence, and if it was done contrary to the advice of Jones, and in conformity with the opinion of the legal adviser of the plaintiff, and whether, without the groove, the description of the thing patented was sufficient, under the third section of the act of 1793, which was read and commented on by the court, who then proceeded as follows.

" The Secretary of State is a ministerial officer, who must issue a patent if the requisites are performed. 6 Peters, 241. The question of inadvertence or mistake is a judicial one, which the Secretary cannot decide, nor those judicial questions on which the validity of the patent depends. He issues the patent without inquiry. The correct performance of all the preliminaries to the

validity of the original patent are always examinable in the court where the fact is brought. 6 Peters, 242, 6, 47.

" In the application of the law to the evidence before you, the first inquiry is into the state of facts existing at the time of granting the patent of 1835 ; did they present a case for renewal, under the rules of law on which we have given you our instructions ? Whether the original patent was invalid or inoperative is more a question of law than fact, to be ascertained on a judicial inspection of the patent, specification, drawings, models, and the evidence of the contents ; the court must construe all written evidence ; but as depositions are considered merely as oral testimony, a jury must decide what parts are proved by them. The court must take as true the statements of witnesses as they are made, and lay down the law on the assumption of their credibility, and both court and jury must take an agreed or admitted uncontested state of facts to be their rule of action ; a jury may deem a witness unworthy of credit, or not believe his statement, but ought to do neither without good cause. Whether the defects in the old patent arose from inadvertence or otherwise is also a mixed question of law and fact, — of law so far as depends on written, and of fact as to parol evidence ; on this subject you have the evidence of Dr. Jones, who officially examined the old patent, &c., and made out the new, and we are mainly left to ascertain the facts in relation to both patents from him. In laying down the law to you, we assume his verity in all he says, and, taking his statement as proof of the facts there existing, our opinion is, that, connected with the publication in the Journal of the Franklin Institute, in 1832, when the matter was fresh in his recollection, and the specification in the new patent, the old one was invalid and inoperative, by reason of noncompliance with the requisites of the act of 1793. That it did not embrace the groove, which was essential to its validity, that the new patent is not for the same invention, and that the plaintiff has not made out a case of such inadvertence, accident, or mistake as justified the issue of the new patent, inasmuch as it appears from the patent for plates on railroads, issued at the same time with the one for short curves, that he had known and described the grooves.

" It is for you to say, whether you will take this evidence as we do ; if you discredit it, in whole or in part, you will find accordingly.

" Another important question arises in this case, on the construction of the seventh section of the act of 1839, taken in connection with former laws, which is, whether the plaintiff can sustain an action for the use of his invention, in the construction of his curves, before the granting of the patent of 1835.

" This section provides, — ' That every person or corporation who has, or shall have, purchased or constructed any newly invented machine, manufacture, or composition of matter, prior to

the application by the inventer or discoverer for a patent, shall be held to possess the right to use, and vend to others to be used, the specific machine, manufacture, or composition so made or purchased, without liability therefor to the inventer, or any other person interested in such invention ; and no patent shall be held to be invalid by reason of such purchase, sale, or use prior to the application for a patent as aforesaid, except on proof of abandonment of such invention to the public, or that such purchase, sale, or prior use has been for more than two years prior to such application for a patent.'

" Though this act is retrospective in its effects on then existing patents, it is not void on that account ; it was within the constitutional power of Congress to enact it as a rule for all cases to which its words and intentions apply, by its fair and legal interpretation, which we must ascertain by looking at the old law ; the mischief and the remedy, which must be traced through the decisions of the Supreme Court ; and the acts of Congress on the same subject.

" In 1808, an act was granted to Oliver Evans renewing his patent, which had expired by its own limitation ; in the interval, the defendant had constructed a machine of his invention, and continued to use it ; after the new patent issued, he was held liable, according to the words of the law, for such subsequent use, but the Supreme Court thus express their opinion of the case, had it rested on general principles: — ' The legislature might have proceeded still further, by providing a shield for persons standing in the situation of these defendants ; it is believed that the reasonableness of such a provision could have been questioned by no one, &c., &c. The argument, founded on the hardship of this and similar cases, would be entitled to great weight, if the words of this proviso were obscure and open to construction.' Evans *v.* Jordan, 9 Cranch, 203."

And thereupon the counsel for the plaintiff did then and there except to the aforesaid charge and opinion of the said court.

The above not being enough of the charge of the court below to the jury, the counsel for the plaintiff in error applied for and obtained a writ of *certiorari* to bring up additional extracts.

The return was as follows.

On searching the record and proceedings of the Circuit Court of the United States, in and for the Eastern District of Pennsylvania, in the third circuit, in a certain cause therein lately depending between James Stimpson, plaintiff, and the West Chester Railroad Company, defendants, we find the following omission in the charge of the judge to the jury, which, in obedience to the annexed writ of *certiorari*, is hereby certified, to wit : — 

" In Morris *v.* Huntington, Judge Thompson held, that after a patent was surrendered, the invention would be open to public use

without hazard, so far as depends on such patent. 1 Paine, 355. In Grant v. Raymond, the court notice the case of the use of the invention between the date of the old and before the new patent, but remark, that that defence is not made ; and the Circuit Court did not say that such defence would not be successful ; and they add, — ' The defence, when true in fact, may be sufficient in law, notwithstanding the validity of the new patent.' 6 Peters, 244. The court, in this and the subsequent case of Shaw v. Cooper, held, that the new patent was a continuation of the old, but gave no opinion on the question, whether damages could be recovered for the intermediate use of a machine constructed after the first.

" This question was, however, put at rest by the last clause of the act of 1832, which, assuming that damages could not be recovered for a use of the patented invention, before the new patent, pro-vides : — ' But no public use or privilege of the invention so pa-tented, derived from or after the grant of the original patent, either under any special license of the inventer, or without the consent of the patentee that there shall be a free public use thereof, shall in any manner prejudice his right of recovery for any use or violation of his invention, after the grant of such new patent as aforesaid.' The act of 1836 is still more explicit, by providing for the right of re-covering damages only for ' causes subsequently accruing.'

" It thus appears, that the act of 1839 goes only one step be-yond those of 1832 and 1836, and is a dead letter, if it protects the person who has purchased, constructed, or used the machine in-vented by the patentee no farther than from damages accruing prior to the new patent, for the same protection is given by those laws.

" To have any effect, it must be held to be, in the words of the Supreme Court, ' a shield,' which covers the party from all liabil-ity, and by so construing it, the act of 1839 embodies the very prin-ciple, and none other, which, in Evans v. Jordan, 9 Cranch, 203, that court declared to be one which they believed that no one could question its reasonableness, in order to prevent the hardship of a case precisely similar in principle to that presented. Such construction is the more reasonable, when it is considered that the protection is confined to the specific machine used before the patent, and cannot be extended to protect the use of any new or other machine, or con-strued to invalidate the patent, or justify the subsequent use by any other persons than those so protected.

" That such was the intention of Congress in relation to an original patent cannot be doubted, and we can perceive no reason why they should omit the very case on which the Supreme Court had so explicitly declared their opinions, if the words of the act of 1808 would have permitted them to apply an unquestionable principle. The act of 1839 not only does not exclude its applica-cation, but authorizes and requires it. In referring to the applica-

tion for a patent, it was evidently intended to apply it to the patent on which the patentee sought to recover, the renewed one, on which alone his right rested, for the law cannot be presumed to be intended to apply to a patent which, being invalid or inoperative, as a ground of action, had been surrendered, cancelled, and cancelled by the act of the patentee himself, and was thus divested of all intrinsic efficiency by the acts of 1832 and 1836. It could have no effect without the aid of the new one, and it would be absurd to suppose that the law overlooked the application for the only effective patent, and looked only to that which derived new life from it; besides, the act of 1839 would take from a defendant the protection of the acts of 1832 and 1836, by confining its operation to the old patent, for damages could then be recoverable for the use between the date and the renewal, — a conclusion wholly inadmissible on a sound construction of either the acts in question.

" The act of 1832 expressly declares that the new patent shall be subject in all respects to the same matters of objection and defence as the original one; from which it necessarily follows, that if the purchase or construction of a machine, before the application for an original patent, would protect a defendant from all liability to the patentee, the same defence is available when applied to the new one.

" This view of the act of 1839 suffices for the purposes of the present case; a broader one has been taken of it, in all its bearings, in another district in this circuit, which it is not now necessary to examine to decide the point now under consideration.

" In the case before us, it clearly appears that the defendants constructed their railroad with the plaintiff's curves in 1834, one year or more before the plaintiff's application for his renewed patent; consequently, they may continue its use without liability to the plaintiff."

The case was argued by *Mr. C. J. Ingersoll* and *Mr. J. R. Ingersoll*, for the plaintiff in error, and *Mr. Miles*, for the defendants in error.

The brief of the counsel on the part of the plaintiff in error was as follows.

This case comes up for argument upon a bill of exceptions taken by the plaintiff to the charge of the learned judge in the court below, by which, in effect, the jury were directed to find for the defendants, which they accordingly did.

The plaintiff took a patent, the 23d of August, 1831, for an invention or improvement in the application of the flanches of the wheels on one side of railroad carriages, and of the treads of the wheels on the other side, to turn short curves upon railroads.

It was surrendered in consequence of a defect in the specification, and a new patent taken by him the 26th of September, 1835.

" The object of such surrender and renewal (see deposition of Dr. Thomas P. Jones, a witness for the defendant, in answer to the first cross interrogatory, *ante*, p. 384) was to limit and confine it to the turning short curves in streets, &c., by leaving out certain matters in it respecting the crossing of tracks or roads, and the passing over turnabouts, and to define the subject-matter of the patent more clearly, without its being necessary to refer to that simultaneously obtained for forming and using cast or wrought-iron plates, &c."

The action was brought at the October session, 1840. The curves used by the defendants were said to have been constructed and first used by them between the dates of the first and second patents, the use being continued by them since the date of the second patent.

The learned judge, after considering at length the law touching this part of the case, said to the jury : —

" It clearly appears that the defendants constructed their railroad with the plaintiff's curves in 1834, one year or more before the plaintiff's application for his renewed patent ; consequently, they may continue its use without liability to the plaintiff."

In Grant v. Raymond, 6 Peters, 244, the defendant made it a question, whether the patentee who took an amended patent could recover damages for the defendant's use, subsequent to the amendment of the patent, of machinery which had been constructed prior to the amendment. The court did not decide the point, thinking it did not come directly up for decision. But they said of it, —
" This objection is more formidable in appearance than in reality. It is not probable that the defect in the specification can be so apparent as to be perceived by any but those who examined it for the purpose of pirating the invention."

Grant v. Raymond was decided early in 1832.

On the 3d of July, 1832, was passed (4 Lit. & Brown's ed. 559) the first act by which the amendment of patents for defective specifications was statutorily recognized. The third section of the act contains a proviso, that the new patent shall be open to all objections which existed against the old one, by virtue of which, if the phrase stood alone, a defendant, in this case, for example, might say, I used your curves before 1835, — before the date of your patent, — that is, between the new patent and the old one, and as a use by the public prior to the date of the patent would be fatal as against the old patent, so it is against the new.

Now to meet such an argument, the same proviso goes on to say, that no use of the patented invention between the dates of the first and second patents, excepting under a surrender of the invention to public use, shall prejudice the patentee's right to recover damages " for any use " after the grant of the new patent.

We quote at length the proviso of the third section.

Stimpson v. West Chester Railroad Company.

"*Provided however*, That such new patent so granted shall, in all respects, be liable to the same matters of objection and defence as any original patent granted under the said first-mentioned act.

" But no public use or privilege of the invention so patented, derived from or after the grant of the original, either under any special license of the inventer, or without the consent of the patentee that there shall be a free public use thereof, shall, in any manner, prejudice his right of recovery for any use or violation of his invention after the grant of such new patent as aforesaid."

It is submitted, that, by the terms of this statute, to use, after the date of the second patent, the patented machinery, even though the specific machine used had been constructed and used between the dates of the first and second patents, is expressly denied to the public.

On the faith of this statute of the 3d July, 1832, the plaintiff, in September, 1835, surrendered the patent granted him the 23d August, 1831, and took an amended one.

Has any act of Congress changed the law in this particular since 1832 ?

As any such law, so far as regards his plaintiff, would be retroactive, it ought to be clearly expressed.

On the 6th of July, 1836, was passed the new patent act, by which the whole system was recast, but the thirteenth section, which relates to amended patents, says in broad terms : —

" And the patent so reissued, together with the corrected description and specification, shall have the same effect and operation in law, on the trial of all actions hereafter commenced, for causes subsequently accruing, as though the same had been originally filed in such corrected form before the issuing of the original patent."

It is submitted that the words, " for causes subsequently accruing," are not to be strained from their natural construction, in order to be made to retroact against the rights already vested under the protection of a statute ; and that the cause of action against these defendants, as far as concerns their use of the patented invention since the 26th of September, 1835, is a cause subsequently accruing within the just and obvious meaning of the act.

In 1837, the 3d of March, was passed an amendment to the law of 1836.

The plaintiff submits that the seventh and ninth sections of the act of 1837 bear on his case, by analogy. They permit a patentee who has patented too much, and more than he invented, to make disclaimer of the excess, with the same effect, as regards the validity of the patent, as if his disclaimer were part of his original specification. That is to say, the patentee shall recover as if his patent had been originally right instead of wrong ; and no exception is made in favor of parties who, like the defendants here, use,

after disclaimer, one of the patented things, which they had constructed and begun to use while the patent was too broad; the legislature being influenced, perhaps, by the suggestion of this court in Grant *v.* Raymond, that that party is not entitled to much favor, who scans a specification in order to pirate it.

On the 3d of March, 1839, the latest amendment of the patent laws was passed.

The seventh section of this act is cited by the learned judge, who asks, what this section means, if it do not mean that the use of a patented machine shall be free to a defendant after the patent, if he constructed it before. It reads thus : —

" Sect. 7. *And be it further enacted,* That every person or corporation who has, or shall have, purchased or constructed any newly invented machine, manufacture, or composition of matter, prior to the application by the inventer or discoverer for a patent, shall be held to possess the right to use, and to vend to others to be used, the specific machine, manufacture, or composition of matter so made or purchased, without liability therefor to the inventer, or any other person interested in such invention ; and no patent shall be held to be invalid by reason of such purchase, sale, or use, prior to the application for a patent as aforesaid, except on proof of abandonment of such invention to the public, or that such purchase, sale, or prior use has been for more than two years prior to such application for a patent."

It is admitted, in answer to the learned judge, that the seventh section of the act of 1839 was intended to protect defendants, constructers of machinery prior to the patent, in the use of such machinery after the grant to the patentee. This section, which has no reference to renewed or amended, more than to all other, patents, is believed to provide for a case, till 1839 unprovided for ; namely, the case in general, whether it arise under an original patent, or under one which has been amended, or which has been modified by disclaimer of the use by a defendant, after the issuing of the letters, of a machine such as they patent, but which specific machine was purchased or constructed before their date. But it is respectfully submitted, that this prior use meant a use prior to the firs*t* or original application of the inventer for his patent, and that th*e* legislature had not in their contemplation the second application of the inventer, when they used the words " prior to the application of the inventer or discoverer for a patent." The last clause of the section has obvious reference to the original application alone, when it is declared that " such purchase, sale, or use, prior to the application for a patent," shall not (except under certain circumstances) make the patent invalid ; for it was clear already, and quite independently of this statute, that no renewed or amended patent could be worth paying for, if the use of the patented machinery by third persons, prior to the renewal, could make it invalid.

Grant *v.* Raymond, however, furnishes the best answer to the learned judge's position, that the plaintiff's patent is liable to be damaged by what has taken place since the date of the original letters.    At page 244 (6 Peters), the court says : —

" It has also been argued, that the new patent must issue on the new specification, and on the application which accompanies it. Consequently, it will not be true that the machine was 'not known or used before the application.'    But the new patent, and the proceedings on which it issues, have relation to the original transaction. The time of the privilege still runs from the date of the original patent.    The application may be considered as appended to the original application."

The plaintiff in error contends, that a true interpretation of the letter of these several acts, and a due regard to the spirit of all recent legislation on the subject of patent-rights, which has been kind. and liberal towards patentees, enforce the conclusion, that it was meant, when the new patent was granted, to give to the new, in all particulars, the charter of the old, unless when restrained by express words to narrower limits.    And further, that while, for obvious. reasons, the acts deny to the patentee a right to recover damages, under the new patent, for a use of the invention of earlier date than the patent itself (which denial is in terms), no express words of the statutes, or fair or necessary implication from them, or leaning, can be found, in the whole course of the legislation since 1832, to warrant the conclusion that the new patent does not confer upon the grantee an entire monopoly of the fruits of his invention, from the date of the second letters to the expiration of the fourteen years from the date of the first.

The plaintiff in error therefore assigns for error the learned judge's instructions to the jury, recognizing the defendants' right to use the patented invention, after the date of the second patent, provided they had commenced its use prior to that date, and continued after that date to use only the specific machine at first used.

The learned judge also charged the whole case to be against the plaintiff upon another question, namely, that of the description of the " groove," in the original patent.

The judge was of opinion that the groove was not in the first patent, and was in the second ; and therefore that the second was broader than the first, and not confined to the thing there patented, and thus was defective as an amended patent.    The plaintiff's patent being, as he supposed, established fully, by judicial sanction of the highest sort, in his contest with the Trenton Railroad Company, reported in 14 Peters, 448, had not even brought with him, when he came to try his cause in Philadelphia, the original letters patent, and the drawings which accompanied them.    Nor was any notice given him by the defendant to produce them.

The result of his suit against the Baltimore and Susquehanna

Railroad Company, tried in the Maryland District, in April term, 1843, when both the original patent and the drawings were produced in court, proved to be quite ill founded the attempt of the defendants, in the present case, to criticise his second patent as actually varying from the first, by the addition of this new matter, the groove.

He is aware, however, that he must sustain his case as it appears by this record, and he proceeds to do so.

The whole invention of the plaintiff consisted of a new method of attaining conical action in turning short curves on railroads. And the groove had no more to do with it than this : — that when to attain this action the outer wheel was mounted upon its flanch, the groove, by receiving the inner wheel, prevented the car from slipping off the track — a very material consideration, it is true — in turning the corner ; and so was the car, or the steam-engine that drew the car ; but neither of them had any thing to do with the plaintiff's method of producing conical action. Without a groove, just as without steam, a horse, or other power, the corner could not be turned ; and therefore, in describing the plaintiff's invention, both this power and the groove must needs be referred to ; but it is respectfully denied, that more than the merest allusion to either is necessary, neither of them being any part of the invention, nor so occult as to demand, for even the most unenlightened observer, more than a mere allusion to it.

Now it was in proof from the witness called by the defendant to testify to the contents of the original specification, that it alluded to the groove.

" I believe, however, that it (the groove) was alluded to in this specification." — Evidence of Dr. Jones.

This allusion to the groove, in the first patent, the learned judge rules, in his charge, to be insufficient, and in the paragraph *ante*, pp. 387, 388, after so holding, he goes on to declare, that the groove should have been " claimed." It may be mentioned that it is not claimed in the new patent, nor even alluded to in the summary of the specification ; so collateral is it to the invention.

The plaintiff in error further assigns for error, in this portion of the charge touching the groove, the learned judge's decision against the plaintiff's right to claim under his patent, because of his alleged omission in regard to the groove ; and particularly to the judge's saying, that, assuming the truth of Dr. Jones's deposition, the opinion of the court was, that the old patent was " invalid and inoperative, by reason of noncompliance with the requisition of the act of 1793. That it did not embrace the groove, which was essential to its validity ; that the new patent is not for the same invention."

Also, the learned judge's taking from the jury the question, which came fairly up as a question of fact, namely, whether this mention

of, or allusion to, the groove was or was not too slight a description of that part of the combination to enable one skilled as an engineer to make a curve, or to stand for a compliance, by the patentee, with the requisition of the statute touching the proper description of the invention.

Also, the learned judge's deciding it to be a matter of law, and not of fact for the jury, what the thing patented in 1831 was, when the evidence of what it was lay not in a written paper, which the judge could read and construe, but in parol evidence, and explanations *per testes.*

Also, the learned judge's not giving the due legal effect to the secretary's seal and letters patent, as *primâ facie* evidence that the second patent legitimately succeeded to the first, and to his assuming, on the contrary, that it was incumbent on the plaintiff, and not on the defendant (who assailed it), to show what the first patent contained, and what its character and defects were, and in the absence of the patent, and of any notice or call for it by the defendant, and in the absence of any satisfactory account of its contents to the learned judge, making the plaintiff, and not the defendant, responsible for the imperfectness of the proofs regarding the same.

The judge left nothing to the jury, as distinctly appears in his summing up, in regard to the groove (*ante*, p. 388), but the question whether Dr. Jones's testimony was to be believed or not. If believed, he told the jury they must find for the defendants, the old patent being defective, in not embracing the groove, and the new patent, which he said did embrace it, being therefore for a different invention altogether.

The plaintiff in error also assigns it for error, that the learned judge ruled "mistake," in the statute about amending patents, to mean inadvertence or accident only, and excluded cases of honest mistakes of judgment.

*Mr. Miles,* for the defendants in error, filed the following brief.

### Abstract of Case.

1. This is a writ of error to the Circuit Court for the Eastern District of Pennsylvania. The plaintiff in the Circuit Court is the plaintiff in error in this court. The verdict in the Circuit Court was for the defendants.

2. The action was brought to recover damages for an alleged infringement by the defendants of an exclusive right, alleged to belong to the plaintiff, to make, use, construct, and vend an improvement "in the mode of turning short curves on railroads," of which he claimed to be the original inventer, and alleged to have been secured to him by letters patent of the United States, according to the acts of Congress.

The plaintiff claimed under letters patent, dated September 26th,

1835, which recited that letters for the same improvement were granted to him on August 23d, 1831, but which were "hereby cancelled on account of a defective specification."

3. The plaintiff declared on the letters patent of September 26th, 1835, in four counts (only varying in the allegation of different modes of infringement, namely, making, constructing, selling, and using), all setting forth that "the said letters patent (that is, of August 23d, 1831) were cancelled in due form of law, on account of a defective specification."

4. The defendants pleaded not guilty, gave due notice to the plaintiff, under the acts of Congress, of a defence based upon the want of originality of invention of the thing patented on the part of the plaintiff, under the several patents of 1831 and 1835, said notice including the prior use and knowledge of other persons, and of prior printed and published descriptions of the same, &c., and under such plea and notice gave evidence to the jury.

The original letters of the 23d of August, 1831, were not in evidence, they having been destroyed in the conflagration of the patent-office in December, 1836, nor was there any copy of them given in evidence.

Their loss or destruction having been proved, secondary evidence was given of their contents. (Journal Franklin Institute, vol. 9, p. 124, No. 37; and by deposition of Dr. Thomas P. Jones.)

The claim, by this evidence, under the patent of 1831, was "to the application of the flanches of railroad carriage-wheels to turn short curvatures upon railroads or tracks, particularly turning the corners of streets, wharves, crossing of tracks or roads, and passing over turnabouts," &c. No mention was made therein of the use of a groove upon the inner circle for the flanch to run in, so as to enable the wheel on the inner circle to run on its tread, without which there was evidence tending to show that the whole alleged invention was useless.

The claim under the patent of 1835 was to "the application of the flanches of the wheels on one side of railroad carriages, and of the treads of the wheels on the other side, to turn curves upon railways," &c., "operating upon the principles herein set forth." The specification referred to in this summary describes the use of the flanch running on the surface of the outer rail, and of the tread running on the inner rail, which is formed with a groove to receive the flanch of the wheel on the inner rail, as the essential parts, which, combined together, form the improvement.

5. Upon the trial, several questions of law and of fact arose. His honor, Mr. Justice Baldwin, charged the jury upon the law, and left the facts falling within the scope of the principles of the law, as laid down by him, to the determination of the jury.

*Points of Law arising under the Charge contended for by Defendants.*

The third section of the act of 21st February, 1793, in substance, provides that the applicant for a patent shall give a description, in full, clear, and exact terms, of the thing invented, and its modes of application.

By the sixth section of the same act, a defendant in a suit brought on letters patent may show that the description (that is, specification) does not contain the whole truth relative to his discovery, or that it contains more than is necessary to produce the desired effect, which concealment or addition shall fully appear to have been made for the purpose of deceiving the public, or that the thing secured by patent was not originally discovered by the patentee, &c.

The third section of the act of July 3, 1832, provides, in substance, that if any patent shall be invalid or inoperative by reason of noncompliance with the terms of the third section of the act of 1793, by "inadvertence, accident, or mistake," and " without any fraudulent or deceptive intention," it may be lawful for the Secretary of State, on surrender of the original patent, to grant a new patent, on compliance with the conditions of the third section of the act of 1793, for the residue of the term unexpired.

The thirteenth and fifteenth sections of the act of 4th July, 1836, which supplied the former laws enacted on the subject, contain in substance the same provisions as to the inoperation of a patent by reason of the defective description, and allowing a surrender and regrant, where the defect arose from " inadvertency, accident, or mistake, and without any fraudulent or deceptive intention."

The seventh section of the act of March 3, 1839, provides, " that every person or corporation who has, or shall have, purchased or constructed any newly invented machine, &c., prior to the application by the inventer, &c., for a patent," may use and vend it at all times, without liability to the inventer or any person, &c.

Under these acts, the following points are submitted to have been judicially decided.

1. That where a patentee, under the act of February 21st, 1793, has not complied with the terms of its third section, even through inadvertence, accident, or mistake, the plaintiff cannot recover for an infringement prior to a surrender and new grant. Grant v. Raymond, 6 Peters, 244 ; Shaw v. Cooper, 7 Peters, 320 ; Whitney v. Emmett, 1 Bald. 303.

2. That if the patentee under the act of 1793 has not complied with the terms of its third section, through fraudulent and deceptive intention, by concealment of or addition to his real discovery, his

patent, by the sixth section, is absolutely void. Grant *v.* Raymond, 8 Peters, 246, 247 ; Whitney *v.* Emmett 1 Bald. 303.

3. (1.) That a surrender under the act in 1832 and a new grant are only sustainable where the defect in the description of the first patent was the result of inadvertence, accident, or mistake. Grant *v.* Raymond, 6 Peters, 246, 247. (2.) That a new grant, on such a surrender, is not sustainable, but is absolutely void, if it appear that the defect in the description of the first patent, whether of concealment or addition, was the result of a fraudulent and deceptive intention on the part of the patentee. (3.) That if a patentee surrendered his first patent, and, under pretence of an inadvertence, accident, or mistake in its description, obtained a new patent, adding thereto a new material or element of which he was not the original inventer, and which is necessary to make the thing patented useful, thus in the second patent specifying another combination, constituting a mode or machine substantially different from that described and claimed in the first, it is fraud in the patentee, and the patent is void. Grant *v.* Raymond, 6 Peters, 218, 244 ; Philadelphia Railroad *v.* Stimpson, 14 Peters, 462 ; Shaw *v.* Cooper, 7 Peters, 292.

*Note.* The act of 1832 (July 3d), authorizing a surrender and regrant, shortly followed the decision in Grant *v.* Raymond, 6 Peters (January term, 1832), and by express enactment provided for that which had before been allowed by practice and judicial construction only.

4. That an original patent, as well as that granted on a surrender of the first under these acts, are *primâ facie* evidence only of the novelty and utility of the alleged invention, and of the compliance by the patentee with the terms of the several acts of Congress entitling him to a patent ; but their validity is examinable in a judicial proceeding upon any such patent, part of the inquiry being within the province of the court where the construction of written documents is to be made, and part being for the determination of the jury where questions of fact are involved. Grant *v.* Raymond, 6 Peters, 218 ; Shaw *v.* Cooper, 7 Peters, 292 ; Philadelphia Railroad *v.* Stimpson, 14 Peters, 448 ; Prouty *v.* Ruggles, 16 Peters, 336.

5. If a patentee's first patent be inoperative for want of a full and exact description, and he stands by for a long and unreasonable period of time, without surrendering and remedying the defect by furnishing such a description, and obtaining a regrant, and in the mean time permits others to use what he subsequently claims to be his invention, with a knowledge of such use without objection or asserting his right, this is evidence from which a jury may infer his acquiescence and abandonment to the public as a matter of fact. Shaw *v.* Cooper, 7 Peters, 320 – 322.

6. Under the act of 1839, if the defendants purchased or constructed this mode of turning curves, before the application for the

patent of 1835, and this combination or mode described in that patent was newly invented by the patentee, the plaintiff cannot recover, notwithstanding the act of 1839 was subsequent to the dates of such purchase or construction, and the patent of 1835. Shaw *v.* Cooper, 7 Peters, 320 – 322 ; McClurg *v.* Kingsland, 1 Howard, 204 ; Evans *v.* Jordan, 9 Cranch, 201.

*Note 1.* This statute was intended to provide expressly and in terms (designating a specific point of time) for all that class of cases of implied acquiescence and waiver in favor of the public resulting from the negligence of the patentee, by which judicial construction held that the patentee had no claim against persons using or constructing the alleged invention under such circumstances.

*Note 2.* This action was brought in the Circuit Court after the passage of the act of 1839, to wit, at the October session, 1840.

The charge of the court left all the facts falling within the scope of the legal principles therein stated to the determination of the jury.

1. " The question of the validity of the new patent is a judicial one, depending on the fact of inadvertence or fraud, as you shall find it." " You must then be satisfied affirmatively," &c. " The finding of the fact of inadvertence may negative the fact of fraud," &c.

2. " It was then submitted to the jury, whether, on the evidence aforesaid, the omission in the patent of 1831 arose from inadvertence," &c.

3. " Depositions are considered merely as oral testimony ; a jury must decide what facts are proved by them, . . . . . a mixed question of law and fact ; of law so far as depends on written, and of fact as to parol evidence," &c.

4. " It is for you to say, whether you will take the evidence as we do ; if you discredit it, in whole or in part, you will find accordingly."

Mr. Justice McLEAN delivered the opinion of the court.

The plaintiff brought an action against the defendant for an infringement of his patent, for a " new and useful improvement in the mode of turning short curves on railroads." The questions for decision arise on exceptions to the charge of the court to the jury. And here it may be proper to remark, that the exceptions are to the charge as published at length, and not to the points ruled by the court, as is the correct practice. Under the peculiar circumstances of this case, the court will not dismiss the writ of error upon this ground, but it is expected that a different course will hereafter be pursued.

On the 21st of August, 1831, the plaintiff obtained a patent for an invention or improvement in the application of the flanches of the wheels on one side of railroad carriages and of the treads of

the wheels on the other side, to turn short curves upon railroads. The specifications of this patent being defective, it was surrendered the 26th of September, 1835, and a renewed one obtained, in order, as proved, "to limit and confine it to the turning short curves in streets, &c., by leaving out certain matters in it respecting the crossing of tracks or roads, and the passing over turnabouts, and to define the subject-matter of the patent more clearly, without its being necessary to refer to that simultaneously obtained, for forming and using cast or wrought-iron plates," &c.

In his charge, the judge said to the jury, — "It clearly appears that the defendants constructed their railroad with the plaintiff's curves in 1834, one year or more before the plaintiff's application for his renewed patent ; consequently, they may continue its use without liability to the plaintiff."

The patent was surrendered, and a new one obtained, under the third section of the "Act concerning patents," of the 3d of July, 1832-; and the correctness of the above opinion is to be ascertained by a reference to the proviso of that section. It is there declared, — "No public use or privilege of the invention so patented, derived from or after the grant of the original patent, either under any special license of the inventer, or without the consent of the patentee that there shall be a free public use thereof, shall, in any manner, prejudice his right of recovery for any use or violation of his invention, after the grant of such new patent as aforesaid."

The charge of infringement, in the declaration, is laid some years after the new patent, so that the question does not arise, whether an action could be sustained for a violation of the right prior to the corrected patent. The above proviso would seem to be susceptible of but one construction ; and that is, that the patentee may sustain an action "for any use or violation of his invention after the grant of the new patent." Now it is plain that no prior use of the defective patent can authorize the use of the invention after the emanation of the renewed patent under the above section. To give to the patentee the fruits of his invention was the object of the provision ; and this object would be defeated, if a right could be founded on a use subsequent to the original patent and prior to the renewed one.

The thirteenth section of the act of the 4th of July, 1836, which remodelled the patent law in this respect, made no material change in the act of 1832. The words in the latter act are, — "And the patent, so reissued, together with the corrected description and specification, shall have the same effect and operation in law, on the trial of all actions hereafter commenced for causes subsequently accruing, as though the same had been originally filed in such corrected form, before the issuing out of the original patent." Now any person using an invention protected by a renewed patent subse-

quently to the date of this act is guilty of an infringement, however long he may have used the same after the date of the defective and surrendered patent.

The Circuit Court relied upon the seventh section of the act of the 3d of March, 1839, as sustaining their construction in regard to the use of the invention after the renewed patent. But that section has exclusive reference to an original application for a patent, and not to a renewal of it. We think the court erred in their instruction to the jury above stated.

In their charge, the court said, — " The use of grooves was not claimed and was no part of the thing patented in 1831, for turning short curves, but was a part of the thing patented in 1835." " That it was an essential part of the invention." And further, " in taking the statement " of Dr. Jones " as proof of the facts there existing, our opinion is, that, connected with the publication in the Journal of the Franklin Institute, in 1832, when the matter was fresh in his recollection, and the specification in the new patent, the old one was invalid and inoperative, by reason of noncompliance with the requisites of the act of 1793. That it did not embrace the groove, which was essential to its validity, that the new patent is not the same invention, and that the plaintiff has not made out a case of such ' inadvertence, accident, or mistake,' as justified the issue of the new patent, inasmuch as it appears, from the patent for plates on railroads issued at the same time with the one for short curves, that he had known and described the grooves."

The original patent, as proved by Dr. Jones, was burnt with the patent-office, and no part of the specifications is preserved, except that which was published by the witness in the Franklin Journal. That publication does not purport to give the whole of the specifications, and, consequently, the claim is not limited by the notice in that journal. Doctor Jones, speaking of the patent issued in 1831, says, — " The main defect, in my judgment, of the original specifications in the patent for turning short curves was the omission of the mention of the groove in the inner rail. I believe, however, that it was alluded to in the specifications, but the description of it was contained principally, if not wholly, in the specification of the patent for forming and using cast-iron or wrought plates," &c.

That there was a defect in regard to the grooves in the specifications of the first patent is shown, and also that the patent was surrendered in order to remedy that defect. But whether this vitiated the patent is not a question in this case, as it does not affect the right now asserted, if the first patent were void. Whether the new patent was substantially for a different invention from the first one, was a question for the jury on the evidence. But the court ruled this point, withdrawing the facts from the jury. The witness thinks " that in the first patent the grooves were alluded to," but the

terms used are not recollected by him, and as the patent has been burnt, they cannot now be proved. We think the Circuit Court erred in not leaving the jury to act upon the facts, as regards the difference between the original and the renewed patent. On the facts, we should draw a different conclusion from that which was given to the jury by the Circuit Court. An allusion to grooves in this specification, as more particularly described in the other patent, would at least show the intention of the patentee, if it did not make good his patent.

By the thirteenth section of the act of 1836, "if the patent shall be inoperative or invalid, by reason of a defective or insufficient description or specification," &c., "if the error has or shall have arisen by inadvertency, accident, or mistake, and without any fraudulent or deceptive intention, it shall be lawful" to surrender it, &c. Now, as in granting the renewed patent, the officers of the government act under the above provisions, their decision must at least be considered as *primâ facie* evidence that the claim for a renewal was within the statute. But this would not be conclusive against fraud in the surrender and renewal, which, on the evidence, would be a matter for the jury. And we suppose that the inquiry in regard to the surrender is limited to the fairness of the transaction. In whatever manner the mistake or inadvertence may have occurred is immaterial. The action of the government in renewing the patent must be considered as closing this point, and as leaving open for inquiry, before the court and jury, the question of fraud only.

The judgment of the Circuit Court is reversed, and the cause remanded to that court, with instructions to award a *venire facias de novo.*