### SMITH and others *v.* MERRIAM and others.

*(Circuit Court, D. Massachusetts. January 22, 1881.)*

1. RE-ISSUE—COMMISSIONER OF PATENTS.
   The decision of the commissioner of patents as to the mere necessity of a re-issue is conclusive.

2. SAME—SAME.
   A mistake as to the necessity of such re-issue does not constitute an excess of jurisdiction.

3. SAME—VARIATION OF CLAIMS.
   Upon such re-issue the claims may be varied in order to express the real invention.

4. SAME—SAME.

    The grant of a re-issue in order to enable the patentee to claim the actual operation of his tools in detail is authorized by statute.

5. RE-ISSUE No. 7,558—NOVELTY.

    Re-issue No. 7,558, for a presser-foot for a sewing machine, intended for sewing stay strips upon boots and shoes, *held not void* for want of novelty.—[ED.

In Equity.

*Geo. L. Roberts & Bros.,* for complainants.

*E. P. Brown,* for defendants.

LOWELL, C. J. The original patent in this case, No. 177,-296, dated May 9, 1876, describes a presser-foot for a sewing machine, intended for sewing stay-strips upon boots and shoes. These are narrow strips of leather sewed over that seam of the upper leather of the shoe which covers the heel or the instep, to protect the seam from the wear of the dress. The strip is folded or doubled over and sewed on each side of the central ridge, or projection of an outward-turned seam, and has a groove on each side, in which the stitches are to be laid. The presser-foot has a groove to fit the projecting seam, and two ribs, or fillets, as they are called in the original patent, to form the grooves. The hole for the needle is made in one of these ribs. One row of stitches is laid, and then the work is turned round and the stitches are laid along the other edge. All this is shortly, but sufficiently, set forth. There is described, besides, a "folding mouth," or tunnel, through which the plain strip is to be passed, in order to be folded or doubled over into the requisite shape. The claim is for "a sewing machine presser-foot, provided with means, substantially as described, for folding and channelling a seam-stay piece, such consisting of the fillets, *e, e,* and of the folder, composed of the tapering mouth, *a,* [and] the partition, *d,* all being arranged with the guide-groove, *b,* and needle-hole, *f,* as set forth."

Soon after this patent was taken out, it was found much more economical and convenient to fold and crease the stay-strip by a separate machine or operation, and then the plaintiff obtained the re-issue, No. 7,558, which is relied on in this case.

In the re-issue, the operation of sewing the stay-strip is described with more fulness of detail than in the patent, and the single claim is replaced by three.

(1) A sewing machine presser-foot for use in sewing stay or saddle pieces to seams, the acting or under face of which is formed with a recess, consisting of a longitudinal central recession to receive the saddle part of the stay-strip, and of side recessions to contain the part of the strip intervening between its central saddle part and its edges, substantially as set forth.

(2) The presser-foot, framed with central and side recessions, as described, and with parallel ribs intervening between the central recessions and side recessions, as set forth.

The third is like the single claim of the original, and is not in issue here.

Upon comparing the claims of the patent and the re-issue, it seems that the patentee has separated his folding mouth from his presser-foot proper; and has also claimed a presser-foot which has recessions or recesses calculated to receive the central and outer swells or beads, whether the grooves for the stitches are formed by the action of the ribs of the presser-foot in the operation of sewing, or had been made in the stay before it is brought to the sewing machine.

The first question which arises is whether the re-issue is valid. Supposing for the present that the thing shown and described in the two patents is the same,—that the presser-foot, which will fit over the seam and make the grooves, and cause the stitching to be made in them, will fit over the bead-shaped edges and cause the stitches to be laid in the grooves which have been made beforehand, and that it will work as a presser-foot upon a seam folded beforehand, independently of the action of the folding mouth,—can the patentee, by a re-issue, modify or divide his claims, so as to embrace these several distinct features of his tool?

A case has been brought to my notice, decided by Mr. Justice Field, on his circuit, which is supposed by the patent lawyers to indicate a new departure in the law of re-issued patents. The high authority and great importance of that

decision will be my apology for a discussion, which, a few weeks since, would have been unnecessary. The case is *The Giant Powder Co.* v. *The California Vigorit Powder Co.* 18 O. G. 1339; S. C. 4 FED. REP. 720.* In it the learned judge is understood to declare that if the court can discover, upon a comparison of the two instruments, that there was no defective specification to be amended, and that the claim was not broader than the invention, the action by the commissioner in granting a re-issue was in excess of his jurisdiction, and void; and that if the patentee claims too little, instead of too much, his specification is not defective by reason of that mistake, but all which he did not claim was dedicated to the public. I do not mean to say that I consider the decision to be as extensive as this; but it is so understood by some members of the bar; and there are remarks in the opinion which lend a color to such a construction.

The Revised Statutes simply re-enact the law upon this subject which has been in force since 1836.: "Whenever any patent is inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the commissioner shall, on the surrender of such patent, and the payment of the duty required by law, cause a new patent for the same invention, and in accordance with the corrected specification, to be issued." Section 4916.

The most natural construction of this law would, perhaps, be, that if a patent should be inoperative by reason of a defective specification, or invalid for claiming too much, the defect might be supplied, or the excessive claim be reduced by reissue. But the courts have given a very different interpretation—much wider in most respects, and narrower in only one. They do not permit a defective specification to be supplied, excepting from the drawings or model; but they do permit the claim to be varied, provided the same invention is

See S. C., 5 FED. REP. 197.

described in both patents, and hold that the decision of the office that the occasion had arisen for granting a re-issue is final.   The law is extremely liberal, perhaps too much so, and has been much abused; but if we change it suddenly we shall make a destruction of titles which it is impossible to contemplate without dismay.

If the court is to decide, by inspection of the original patent, that it was not defective, the result is this:   That after a patentee, upon the best advice which he can obtain, has been instructed that his specification needs amendment, and obtains a new patent, the court may say, "We are unable to see any defect, and your re-issue, however honestly obtained, is bad, because your original patent was so good."

The mistake is one of law, and the commissioner does not usually decide the law finally; but as to the mere question of the necessity for a re-issue, supposing the new patent itself to be unobjectionable, his decision has always been held to be final; and this for an unanswerable reason, that no patentee, however honest or careful, can be safe in obtaining a re-issue, if he is to be informed, when he gets into court, that the judge is unable to see why he should have surrendered his first patent.   The slighter and more obviously unobjectionable the change, the stronger will be the argument that there was no occasion to make it; so that honest and careful patentees will be the most likely to suffer.

It does not help the matter to call the action of the commissioner an excess of jurisdiction.   I know that the courts have called these mistakes jurisdictional.   They did this to overrule, without positively saying so, the early cases which held the action of the commissioner within his jurisdiction to be final.   It is obvious that the commissioner has the same jurisdiction to issue a bad patent as to issue a good one.   As his action is *ex parte* it does not bind the world, excepting in certain matters which it is both unjust and inconvenient to review.   A mistake by him as to the necessity of issuing a new patent is not an excess of jurisdiction, but a mistake in a matter clearly within his jurisdiction; and the real ques-

tion is whether it is one which the courts will correct by destroying a new patent after the old one has been surrendered.

Upon questions of the validity of a patent, or of a re-issue, in all great matters of novelty and construction and patentability, the decision of the commissioner is not final, though his jurisdiction is undoubted; but I repeat that urgent reasons of justice require that upon the mere question whether the paper called a re-issue shall be given, his finding should be, as it has hitherto always been held to be, conclusive.

Again, if it be found that the claims of the original patent were valid, and that the re-issue for the same invention states the claim or claims in a different way,—though it may be a better way for the patentee,—the change does not of itself vitiate the new patent; but, on the contrary, the original claims are conclusively presumed to have been made as they were through inadvertence, accident, or mistake. The law is so well settled that most of the reports do not contain the claims of the two patents; but I suppose that no re-issue has ever contained the exact claims of the original, and this can be discovered, incidentally, in many of the cases, and positively in some, where the very point is passed upon. See *Allen* v. *Blunt*, 3 Story, 742; *Stimpson* v. *Westchester R. Co.* 4 How. 380; *O'Reilly* v. *Morse*, 15 How. 62; *Batten* v. *Taggert*, 2 Wall. Jr. 101; S. C. 17 How. 74; *Bennet* v. *Fowler*, 8 Wall. 444; *The Goodyear Cases*, 2 Wall. Jr. 283, 356; 2 Cliff. 351; 9 Wall. 798; *Seymour* v. *Osborne*, 11 Wall. 516; *Roberts* v. *Ryer*, 91 U. S. 150; *Marsh* v. *Seymour*, 97 U. S. 348; remarks of *Bradley*, J., in *Powder Co.* v. *Powder Mills*, 98 U. S. 136, and of the same learned judge in *Carlton* v. *Bokee*, 17 Wall. 463, where he intimates that a re-issue may be good as to those claims which agree with the invention, and void as to others which exceed it; *Cochrane* v. *Deener*, 94 U. S. 780; *Conover* v. *Roach*, 4 Fisher, 12; *Stevens* v. *Pritchard*, 10 O. G. 505; *Herring* v. *Nelson*, 14 Blatchf. 293; *Johnson* v. *Flushing R. Co.* 15 Blatchf. 192; *Analin Co.* v. *Higgins*, Id. 290; *Pearl* v. *Ocean Mills*, 11 O. G. 2. None of

these cases, unless it be *Batten* v. *Taggert*, 17 How. 74,—which is perhaps inconsistent with *Leggett* v. *Avery*, 101 U. S. 256,—has been overruled; and a great many similar cases could be cited. It has been brought out a little more decidedly by the later cases that the invention must be the same; but it has never been held in the supreme court, or any circuit court, so far as I can discover, that the commissioner's decision is not final as to the propriety of a re-issue, as distinguished from its validity upon what may be called its merits; or that the claims may not be varied to express the real invention. The claim is part of the specification, and if defective may be amended. *Russell* v. *Dodge*, 93 U. S. 460, in which the decision is given by Mr. Justice Field, and which is cited by him in the *Powder Co.'s* case, merely decides that a re-issue which claims a different invention is void. A similar decision has been made at this term of the supreme court, in giving which Mr. Justice Strong states the law in the old way, that the commissioner's decision is final as to the mistake, but not as to the identity of invention. *Ball* v. *Langles*, 18 O. G. 1405. The only cases which he cites are *Seymour* v. *Osborne* and *Russell* v. *Dodge*, which he evidently considers to be consistent with each other.

I conclude, therefore, that the re-issue was granted to correct some inadvertence, accident or mistake. Whether it is valid is quite another matter. I have read with diligence the very voluminous record, and am satisfied that the presser-foot described and shown in the original patent and model has the functions claimed in the re-issue. It was a tool which was fitted for a particular purpose, and if the claim had been well adapted to the invention it would not have been necessary to re-issue the patent, for no one could have justified a piracy of the presser-foot by omitting to use the folder which was attached to it. The tool was not a combination, but an aggregation of two entirely distinct tools, one to fold and one to press; that is, hold the work to be sewed. The doubt whether the presser-foot would work by itself was dissipated by the evidence, and by a successful experiment in open court.

So it will operate and produce its results as a presser-foot, though not all the results, when the grooves have been made in the stay-strip before it is sewed.

The re-issue, then, was granted in order to enable the patentee to claim the actual operations of his tool in detail, which is a perfectly legitimate reason for a re-issue, until the law is changed by congress or the supreme court.

One great dispute of fact is whether the invention was, in fact, new. One Turner swears that he made a presser-foot of the same sort seven years earlier. Turner was employed by the plaintiffs to sell their presser-foot, and, while so employed, tried to undersell them with one of his own. For this fraud he was discharged, and went into the employ of the defendants, and procured a patent on his presser-foot. How this came to be granted, without an interference, I am not informed. The invention appears to me to be, in substance, identical with that of the plaintiff. However, Turner says that this was a revival of a presser-foot which he had made years before, and there is some testimony to support him. It is open to the criticism so often made upon such remembered inventions, which never went into general use. Against it, the plaintiffs bring strong negative evidence of many persons who must have seen and used the thing if it existed. They go further, and bring thirty witnesses to impeach the character of Turner for truth; and two who swear that he tried to bribe them to remember his presser-foot. None of the evidence to character is met, or attempted to be met, excepting by the testimony of one of the defendants. It is not made out, to my satisfaction, that Turner made his presser-foot before Sutherland made his.

The respondents insist that Turner's presser-foot, whenever it may have been invented, differs essentially from that of Sutherland, in that it has its central recession or depression much deeper than those upon the sides, so that it will fit much better the ordinary shape of an outward turned seam. This argument is used both as to novelty and as to infringement. I find, however, as matter of fact, that Sutherland's foot is

capable of doing the work; and, that being so, the precise relative proportions of the recessions are matters for the constructor.

With this view of the patent, it is admitted that the respondents have infringed it.

Interlocutory decree for the complainants.