HOELZLE (MANHATTAN LIFE INS. CO. v.). See Case No. 9,025.

---

## Case No. 6,575.

### HOFFHEINS et al. v. BRANDT.

[3 Fish. Pat. Cas. 218.] [1]

Circuit Court, D. Maryland. July, 1867.

PATENTS—JURISDICTION IN EQUITY — FRAUD—RE-ISSUE—UTILITY—PATENT IS PRIMA FACIE EVIDENCE OF ITS LAWFUL ISSUE.

1. The current of decisions of the last few years, has been, that the grant of jurisdiction in patent cases, is as full in equity as it is at law.
[Cited in Vaughan v. East Tennessee, V. & G. R. Co., Case No. 16,898; Atwood v. Portland Co., 10 Fed. 285.]

2. If in any case fraud is maintained, no court will grant relief to the party on whom the fraud is proven. Fraud contaminates and vitiates every transaction, and to the guilty party completely closes the door of redress.

3. A reissue can be obtained only for that which was the original and true invention of the patentee, but which he failed to claim or describe in the original claim and specification.

4. The invention must be shown in some part of the patent, specification, drawings, and model, or it can not be covered by the reissued patent.

5. All that the law requires, as to utility, is that the invention shall not be frivolous or dangerous; it does not require any degree of utility; it does not exact that the subject of the patent shall be better than anything invented before, or that shall come after. If the invention is useful at all, that suffices.
[Cited in Cook v. Ernest, Case No. 3,155; Converse v. Cannon, Id. 3,144.]

6. The patent itself is prima facie evidence that it was lawfully issued, and that the party who claims it is the original inventor; and if it be assailed, the proof must come from the party calling the validity in question.

7. The reissued patent, unless fraud upon the patent office be proved (and it must be proved, never inferred), is prima facie evidence that there has been no abandonment of the invention to the public, and the burden of proof is on the defendant to show that any surrender to the public has taken place.

8. The reissue furnishes prima facie evidence that everything necessary to justify the commissioner in granting the reissue had been produced before the grant was made.

This was a bill in equity, filed [by Reuben Hoffheins, Joseph H. Shireman, and others],

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

to restrain the defendant [George W. Brandt] from infringing letters patent [No. 7,813] for an "improvement in horse-rakes," granted to Harvey W. Sabin, December 3, 1850, extended for seven years from December 3, 1864, to Calesta E. Sabin, administratrix of Harvey W. Sabin, deceased; by her assigned to Charles Mason, Robert W. Fenwick, and De Witt C. Lawrence; reissued to said assignees, March 28, 1865, in four divisions, numbered respectively 1912, 1913, 1914, and 1915, and by them assigned to complainants. The bill charged the infringement of reissues 1914 and 1915. The claims of the original and the reissued patents in controversy were as follows: Original patent, December 3, 1850: "What I claim as my invention and desire to secure by letters patent in my improved horse-rake, is the device for raising the teeth simultaneously to clear them of the hay, and dropping them again, by means of the apparatus, substantially as described, being worked by the draught of the team when thrown into gear, at the will of the operator." Reissue No. 1914: "First, the application of pressure, at the will of the operator, to metallic spring rake-teeth, which are so constructed as to have a spring action within themselves from their gathering ends to the point, or forward thereof, where the pressure is applied to hold them down to their work, substantially as herein described. Second, the combination of independently articulating rake teeth, which are springs within themselves, and a pressure contrivance which is under the control of the operator, substantially as and for the purpose herein described." Reissue No. 1915: "Arranging rake teeth on articulating, tubular laterally-bracing and vertically-supporting eye-bearings, so that the attaching end of each tooth shall cross or intersect a vertical plane passing longitudinally through the axis of the bearings, substantially as described."

John H. B. Latrobe, for complainants.

William J. Waterman and William Schley, for defendant.

GILES, District Judge. This case presents some interesting questions. They have been argued with that ability which is universally recognized as belonging to the counsel engaged in the cause; and I have tried to do justice to the arguments by a patient review of the authorities to which I was referred, and by a thorough examination of the evidence. The suggestion was made, at the commencement of the hearing, that possibly the case ought to go to a jury, as it involved the question of the originality and usefulness of the invention; but an examination of the pleadings and evidence showed, that the case had been prepared to be submitted, on final argument, here, for trial; and the grant of jurisdiction, by the act of 1836 [5 Stat. 117], seems to the court to be as full in equity as at law. There at one time prevailed, in the circuit courts of the United States, the idea

that the court, as a court of equity, would interfere in aid of a patentee only where his patent was sanctioned by general acquiescence for many years, or had been maintained at law, by the verdict of a jury, who had passed upon the novelty and utility of the invention, when called in question. But I think that the current of decisions of the last few years has been otherwise; and that courts of several of the circuits have held (and these decisions, too, have been made by the presiding judges of those circuits, who are members of the supreme court) that the grant of jurisdiction is as full in equity as it is at law. To sustain that view, I refer to Allen v. Blunt [Case No. 215]; Nevins v. Johnson [Id. 10,136]; Sanders v. Logan [Id. 12.293].

I proceed, then, to the discussion of the case at bar. This is a bill filed on the equity side of the circuit court of the United States for the district of Maryland, praying an injunction to restrain the infringement of the complainants' patent for a horse-rake, and asking for an account. I would here incidentally remark, that while the jurisdiction is full and ample, that remedy only can be granted in equity which a court of equity is competent to give. A party can sue at law for damages for an infringement, but in equity he can obtain no such damages. His right may be maintained and protected for the future, and an account may be required. I recite the bill as it should have been framed. A slight mistake occurs in its statements. I read it as corrected by the counsel at bar. It states that:

"Harvey W. Sabin, who was at the time the original and first inventor of a new and useful improvement in horse-rakes, and a citizen of the United States, made application, in writing, to the commissioner of patents of the United States for letters patent for said improvement, and having then and thereafter fully complied with all the requisitions of the acts of congress in such case made and provided, did thereupon obtain letters patent of the United States in due form of law, bearing date on the third day of December, in the year 1850, granting to the said Harvey W. Sabin. his heirs, administrators, or assigns, the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, the said improvement in horse-rakes, for the term of fourteen years from the said third day of December, in the year 1850. That the said Harvey W. Sabin having departed this life, letters testamentary were duly granted to Calesta E. Sabin, by the prothonotary of Niagara county, in the state of New York; and that the term of fourteen years being about to expire, the said Calesta E. Sabin, administratrix as aforesaid, made application to the commissioner of patents to have the said letters patent extended for the further term of seven years; and the said Calesta E. Sabin having brought herself within the scope of the provisions of the act of congress authorizing the extension of letters patent, and complied with all the requisitions of the acts aforesaid, the said letters patent were extended by the said commissioner of patents seven years from December 3, 1854." That subsequently to said extension:. "The said Calesta E. Sabin. by an assignment duly executed and recorded, conveyed all the interest of the said Harvey W. Sabin, his heirs, administrators, or assigns, in the said letters patent, extended as aforesaid, to Charles Mason, Robert W. Fenwick. and De Witt C. Lawrence, of the city of Washington." The bill further states: "That the said assignees having surrendered the said letters patent, the same were canceled and new letters were ordered to be issued to the said assignees on four amended specifications, which were accordingly issued, bearing date on the twenty-eighth day of March in the year 1865, and numbered, respectively, Nos. 1912, 1913, 1914, and No. 1915, as will appear by reference to copies of the said reissues duly authenticated. * * * That the said Mason, Fenwick & Lawrence, did, on the nineteenth day of May, 1865, by an instrument duly recorded, assign to" the complainants "all their right, title, and interest in and to the letters patent, so as aforesaid reissued on four amended specifications, by which said assignment" the complainants "became and now are entitled to all benefit and advantage from said letters patent, the extension and reissues aforesaid. That ever since the said nineteenth day of May aforesaid, the defendant, well knowing the premises, and fully aware of the rights of" the complainants, "but contriving to injure them and deprive them of the benefits and advantages which they otherwise would have derived, and without the license of" the complainants, "and wholly without any authority whatsoever, has unlawfully made, constructed, and used, as well as vended to others to be used, the new and useful improvements in those rakes, which are particularly specified and described in reissues No. 1914 and No. 1915, aforesaid. * * * That the defendant continues to manufacture and sell said rakes, though warned and requested to desist therefrom." And the complainants therefore pray for an account, and a perpetual injunction, etc.

The answer of George W. Brandt sets up several defenses. First and principally, fraud in procuring the extension of said letters patent, and in surrendering the same and obtaining the four reissued patents for the invention made, or alleged to be made. by Harvey W. Sabin. The circumstances on which this charge of fraud is based are set forth in the answer as follows:

"That said Messrs. Mason, Fenwick & Lawrence are a firm who have been engaged for some years in business in the city of Washington, in the District of Columbia, as solicitors for patents, and in practice generally, as patent lawyers; and that the re-

spondent having occasion for legal advice in relation to his rights and interest, as assignee of a certain patent previously granted to one Randall Pratt, consulted and retained said firm as his legal advisers in that behalf; and that the relation of attorney and client was thus created between said Messrs. Mason, Fenwick & Lawrence and the respondent, and said relation was subsisting at the time of the alleged granting of letters of administration on the estate of the said Harvey W. Sabin, and at the alleged assignment to the said Messrs. Mason, Fenwick & Lawrence, and at the time of the alleged surrender of the patent so granted to the said Harvey W. Sabin, and at the time of the said reissues, marked as stated in said bill, No. 1912, No. 1913, No. 1914, and No. 1915. That during the time aforesaid, and after the retainer by the respondent of the said Mason, Fenwick & Lawrence, and *the payment to them of a large retaining fee, and whilst they were possessed of the said patent so granted as aforesaid, to the said Randall Pratt, and whilst employed and occupied on behalf of this respondent to procure reissues of said patent so granted to said Randall Pratt, and assigned as aforesaid to the respondent, and whilst reporting to the respondent, as the respondent avers they did report, that there was nothing to interfere with the right of the respondent as assignee as aforesaid, and nothing to invalidate in any degree the said patent so granted to the said Randall Pratt, the said Messrs. Mason, Fenwick & Lawrence, in utter disregard of their obligations to this respondent as their client and employer, and with the intention to procure to themselves some rights, actual or semblable, adverse to the respondent, sought out the representatives of said Harvey W. Sabin, and procured in some way (but whether in due form of law the respondent does not know) letters of administration to be issued on his estate, and procured, for some trifling consideration, an assignment to be made to them of said letters patent granted to said Sabin by the person who claimed to be the personal representative of the said Harvey W. Sabin; and afterward, and whilst acting as attorneys for the respondent as such assignee of the said patent granted to said Sabin, surrendered said patent (just previously extended by their procurement, and whilst acting as attorneys for the respondent as aforesaid), and procured said reissues marked, as alleged, No. 1912, No. 1913, No. 1914, and No. 1915; and still continuing to act as attorneys for the respondent, procured for the respondent, as assignee of the patent of the said Pratt, the several reissues to the respondent as assignee on the surrender of the said letters patent granted to said Pratt (save one which has since been granted to the respondent by the patent office); and when asked by the respondent whether there was anything discovered which could interfere in any way with the rights of the respondent, he was by them assured that they had made a very thorough examination, and nothing had been found which at all interfered with the reissued letters of the respondent. That he cheerfully paid to them all charges, expenses, and their fees incurred in the procurement of the said reissues of the said letters patent of the said Randall Pratt. That the said complainants had knowledge of all these facts, and he avers that they were not bona fide purchasers without notice, from the said Mason, Fenwick, & Lawrence, but had, in fact, at the time they purchased, and before payment of the purchase-money, full and actual notice of all the facts aforesaid. He avers that no better title vests in complainants than vested in said Mason, Fenwick & Lawrence." The fraud charged is fraud upon the defendant. It is further charged that the complainants had knowledge of all these facts, when they purchased said reissued patents. The second defense denies that Sabin's original patent was for a new and useful improvement in horserakes, or one that could be put into practical operation. The third defense is a denial of any infringement of such patents, even if they be good and valid. The fourth is that Sabin's patent had been surrendered to the public, by Sabin's failure to make or sell any rakes, as set forth and described in said letters patent, etc. Fifth, that the assignment made by Mrs. Sabin to Mason, Fenwick & Lawrence, when they were acting as the defendant's attorneys, inured to his benefit.

I shall examine these defenses in the order in which they have been taken.

The first is the charge of fraud. This, of course, is entirely a question of fact. If, in any case, fraud is maintained, no court will grant relief to the party on whom the fraud is proven. Fraud contaminates and vitiates every transaction, and to the guilty party completely closes the door of redress. This charge has in the argument been pressed with a great deal of ardor. I have read and re-read the testimony upon this point. Now, it will be borne in mind that these charges are not responsive to any allegations in the bill. They have not, therefore, the force of evidence, and require separate and independent proof.

And, first, were Mason, Fenwick & Lawrence, attorneys of defendant in all matters relating to his patent, or were they employed for a specific purpose, which they accomplished, and for which, and for which alone, they were paid? Let us examine the evidence on this subject. Brandt's own testimony will be found on pages 45, 46, and 47 of the printed record. He says, in answer to the sixth interrogatory: "For what purpose did you visit them, and what then and there occurred? State particularly. Answer. I visited them for the purpose of ascertaining whether reissues could be pro-

cured on the patent. I showed them my title papers. Mr. Fenwick took me to an adjoining room, and introduced me to a gentleman whom he called Judge Mason, and stated, 'Here is the owner or assignee of the Pratt patent, which interfered so much in obtaining patents on other rights.' The judge replied that he thought the owner of the Pratt patent would wake up to his interests some day. Mr. Fenwick said that we would walk over to the patent office, and examine the patents. On the way, as we were going there, Mr. Fenwick stated that if I had told him the name of the patent when I had seen him before, he would then have told me all about it. At the patent office, he called on a gentleman who came and opened the cases where the models were. We got the Pratt model and looked at it, and Mr. Fenwick took notes from the model." In another part of his testimony he says: "I asked him what the charge would be, and Judge Mason said it would depend on the number of divisions; the more divisions, the more would be the cost. I remarked that I wanted the reissue in the most secure manner, and that as I considered them my counsel, I would leave it to them. Mr. Fenwick said that he would not have less than four divisions. Judge Mason then said that if it were in four divisions, it would cost two hundred and ninety dollars," etc. Now, if the question stood alone upon the testimony of Mr. Brandt, it is perfectly patent, to me, that these gentlemen were employed by him for a specific purpose. He says expressly, that he went to them to get a reissue of the Pratt patent. But did he dream, or did any other man dream, that, getting a reissue of the Pratt patent, he could incorporate with it any other improvement or invention than the Pratt patent itself contained? He says he went to them to procure reissues on the Pratt patent; that is, to procure reissues on the Pratt patent for what was invented by Pratt and shown by the Pratt model or drawings, but which the specification failed to claim. That is all. It can be nothing more.

It is to be remarked, here, upon his testimony and that of Smedley—and this is the only testimony produced by the defendant to sustain the grave charge of fraud, which is not only to defeat the complainants in this suit. but to assail the character of men of high reputation. engaged in the business of patents, and whose success in business depends upon the maintenance of that high character, not only for skill. but for integrity—it is to be remarked. here, that Mr. Brandt himself, either in the correspondence or in the evidence, is nowhere shown,-at the time when these parties notified him that they were the owners of the Sabin patent, ever to have claimed its ownership. Mr. Mason, whose testimony on the subject appears upon page 12 of the printed record, states that his firm was employed by Hoff-

heins & Co., and also by the defendant. It appears from all the testimony, that these gentlemen, as patent agents in Washington, were employed by Brandt, the defendant, to procure four reissues on amended specifications of the Pratt patent; and that in the course of an investigation for another party, it was discovered that one matter claimed in his fourth specification had been covered by the original Sabin model. What is his complaint to-day? It is that, with this knowledge, Mason, Fenwick & Lawrence did not go on and practice deceit and fraud upon the patent office, by concealing this fact—which might have escaped the eyes of the examiners in the office—and have this claim embraced in the fourth branch of the reissued patent. That is the respondent's defense. Well might he have charged them with fraud if they had taken part in such a transaction! But as soon as they discovered the .fact, they told him they could not procure for him all he wanted in these four reissues, because the patent of Sabin was found to interfere. "We can not do it," they said in substance; "if you do not think it proper to go on, if you think your other reissues will be valueless, we will hand you back the money you have paid us so far, and stop the business." He thought otherwise, and proceeded to obtain the grants covered by the other reissues of the patent. The whole correspondence, which I have not now time to read, shows this state of facts. It shows that these parties were employed for a specific purpose, which they accomplished, in procuring for Mr. Brandt reissues of all he had a right to claim, as covered by the original patent, models, and drawings of Pratt. I can find, therefore, in the whole of this evidence, from beginning to end, nothing whatever to sustain the charge of fraud so gravely made and so strongly pressed in this case against these gentlemen.

We come to the second defense, the want of originality and usefulness in the Sabin patent. In the discussion of this branch of the case, we must first settle what was the invention of Harvey W. Sabin in 1850. In order to ascertain that, where are we to look? Are we to look at the specification of the patent alone? or have we not a right to look also to the drawings which accompany those specifications, and are referred to in them, and to the model which is placed in the patent office? I hold that we clearly have a right to look to any of these. For, under the true construction of the patent act of 1836 [supra], a reissue can be obtained only for that which was the original and true invention of the patentee, but which he failed to claim or describe in the original claim and specification, in such a manner that a person skilled in the art could, from that specification, construct the machine, or the subject of the patent, whatever it might be. The invention must be shown in some part of the patent, specification, drawings, and mod-

el, or it can not be covered by the reissued patent. As authority for this canon of construction, see Hogg v. Emerson, 6 How. [47 U. S.] 485, and the case of Stephens v. Salisbury [Case No. 13,369].

We look, first, then, at the claim in the Sabin patent. Many of the distinctive features as claimed in reissues Nos. 1914 and 1915, are not set forth in that original claim, nor are they set forth in the specifications of the original patent. But do they not appear by the drawings? What are the claims in reissues Nos. 1914 and 1915? That of No. 1914 comprises the elastic or springy teeth, having a spring action within themselves, from their gathering ends to their point of juncture with the axis, combined with the pressure-bar, and that combined with separate articulation, upon the axis. In No. 1915 is claimed the arrangement of these teeth on tubular, lateral, as well as direct supports, and the tangential connection of the tooth with the axis. Look at the drawings attached to the original Sabin model. What mean those flat metallic teeth? The teeth must be metallic, and they must be springy from their gathering points to their tangential bearings upon the axis. A pressure-bar is certainly sown; but what mean the flat metallic teeth? Look at the testimony on page 61 of the printed record, that of Mr. Octavius Knight, the expert of the defendant: "Thirty-Third Cross-Interrogatory. Looking at the model, as an expert, does the flatness of the teeth indicate the purpose of the inventor to make them operate as springs? Answer. In my opinion it does." These specifications and drawings are not for the eye of the crowd; they are for the eye of an expert, of a skilled mechanic. An expert, or a skilled mechanic, will say: "Of course, if I am to make a machine upon that specification, I will make it with a spring tooth, for the inventor has intimated that to me, by making the teeth metallic, and placing them flatwise."

We must look at the model, which is as much a part of the patent as the specifications and drawings, and which the patent laws require to be preserved, to illustrate anything that may be doubtful to the mechanic who undertakes to make the machine from the patent after the patent has expired. For the great object of the patent law is to give activity to the ingenuity of the country, granting an exclusive privilege for seventeen years (as the law now stands), but leaving evidence of the process to all who may thereafter desire to copy it, and leaving that evidence not only to the mind, but to the eye, in the model, for the benefit of the mechanic who comes in after years to make a machine from its pattern. Here is the model before us. Here is a pressure-bar; here is a separate articulation to the eye-bearings; here is a tooth that is springy from its gathering end to its tangential connection with its axis.

Now what says Mr. Edward S. Renwick,

the expert examined by the complainants, upon this subject? "Third Interrogatory. Have you examined letters patent of the United States, granted originally to Harvey W. Sabin for an improvement in horse-rakes, which was reissued in four parts, numbered respectively Nos. 1912, 1913, 1914, and 1915, and especially Nos. 1914 and 1915? And if yea, do you understand the principle and mode of operation as described in said Nos. 1914 and 1915, as the description is addressed to an expert in such matters? Answer. I have examined printed copies of the four divisions or reissued patents referred to in the question. I have also examined the reissued letters patent Nos. 1914 and 1915, referred to in the question. I believe that I understand the construction and operation of the machines described in the last two reissued patents referred to in the question. Fourth Interrogatory. Look at the model now shown you, with the certificate of the patent office attached thereto, and marked 'Frederick Pinkney, Commissioner, No. 1,' and say whether it does or does not exhibit the inventions described in Nos. 1914 and 1915, respectively, in their principle and mode of operation. Answer. I have carefully examined the model referred to in the question, and find that it correctly represents the inventions described in the reissued patents Nos. 1914 and 1915."

It being perfectly apparent, then, that we have evidence, full and satisfactory, that the reissued patents Nos. 1914 and 1915 were reissues of inventions shown by the drawings and model of the original Sabin patent, and were therefore properly reissued by the commissioner of patents, we now come, in the discussion of this defense, to inquire whether that invention was original with Sabin in 1850. Was the combination of these features, the springy metallic tooth, the pressure-bar, the separate articulation of the teeth, and the lateral bracing, new, in the year 1850, and was Sabin the first inventor of that combination? It will be borne in mind, in the examination of this question, that neither of these claims are for a particular specific invention of any one thing. For instance, the separate articulation, or the independent eye-bearings, were not new; but it is the combination of the pressure-bar with the metallic spring teeth, and their final combination with a separate articulation and with lateral bracings, that is claimed.

I would here remark of the grant of this reissued patent, as of that of all other patents, that they are prima facie supposed to be correct. Whatever might have been the rule under the patent act of 1793 [1 Stat. 318], since 1836, before a patent can issue, the drawings and the model have to be filed with it, and it has to be examined by a board, before it can be granted (and the reissues go through the same process). The patent itself is prima facie evidence that it was lawfully issued, and that the party who claims it is

the original inventor; and if it be assailed, the proof must come from the party calling the validity in question. Corning v. Burden, 15 How. [56 U. S.] 270; Allen v. Hunter [Case No. 225]; Philadelphia & Trenton R. Co. v. Stimpson, 14 Pet. [39 U. S.] 458. "But," says the counsel for the defendants, "the burden of proof being upon us to assail the originality of the Sabin patent, we deny its originality; and we have accordingly offered in evidence six patents, or applications for patents, and four models, all of which we hold to have anticipated Sabin's claim." The patents are Smith's English patent; the Delano patent of February 27, 1849; Milligan's patent, August 7, 1848; Carlisle's, May 15, 1847; Eli Saunders', October 24, 1848; and Reed's application, January 7, 1850. We have the Landreth machine, as it is called, the full-sized iron machine, which is said to be made after Smith's patent; and we have three models besides. I have looked through all these patents very carefully, and have with the same care examined the models. Now, I do not want any expert to illustrate a model to me. I feel myself competent to form my opinion when I see a model. I do feel the great benefit of the testimony of experts when we come to examine and construe the specifications and drawings of patents; for I do not profess to be skilled in the technical language of machinists, but of the models I can judge. I can, after patient observation of these models, find none of them that has metallic teeth having a spring action in themselves from their gathering ends to their bearing upon the axis. I can not find any that has the combination of the pressure-bar with the metallic teeth.

Saunders' patent is for an improved racket or shaft, to lift up the rake. It rests on the axle, and is so arranged as to relieve the horse of its weight. Carlisle's patent is for a combination box, with shafts, for the purpose of keeping the rake down to its work. Reed's application exhibits no elastic teeth. It does not pretend to possess metallic teeth springy throughout their entire length. Delano's patent has an independent action of each tooth, and nothing else; it has no pressure-bar. The English patent of Smith has none of these elements whatever, no elastic tooth and no pressure-bar. In Milligan's model, the only pressure-bar is the head of the rake.

I look in vain among these models for this invention. I find in one the pressure-bar, in another the separate, independent articulation of the tooth; I find the tooth made in different forms, but all rigid, with no elasticity, except that in one of the models I find a metal elastic spring, about one-eighth the length of the tooth, put upon the top of it; but in none of the models or specifications do I find anything that approaches the Sabin invention of 1850, which consisted of the combination of the pressure-bar acting at the will of the operator, the metallic elastic tooth, springy from its gathering end to the point of connection with the axis, and these combined with such a separate articulation upon the axis as to give a lateral as well as vertical support where the teeth are connected with the axis. These are the elements of the combination claimed, and I can not find them combined in any of the patents offered in evidence by the defendant.

What says the testimony of the experts? We will look first at that offered by the defendant, because he is bound to make out the existence, in some of these machines, of the features of the invention. Mr. Knight was the defendant's only expert, and Mr. Renwick the only one called on behalf of the complainants. Mr. Knight's testimony commences on page 54: "Interrogatory. Look at the first claim in No. 1914, and say if you know of any machine earlier than Sabin's, answering said claim; if yea, what is it? State what you know. Answer. I find in the model, which is certified under the seal of the patent office to be a true copy of that pertaining to the application of G. M. Milligan, filed in the patent office, of 7th August, 1848, and rejected on the 21st of September, 1848, metallic spring rake-teeth, and handles attached to a bar which constitutes the head of the rake, and is hinged to the frame of the implement. I find that these handles are adapted, and manifestly designed to enable the operator, at will, to exert a downward pressure on the teeth to hold them to their work." That is not the contrivance of the Sabin model. That of the Sabin model is an independent pressure-bar. "I further find that the metallic spring teeth, in this model, have a spring action within themselves from their gathering points to the points at which the downward pressure is applied to them at the will of the operator. I therefore regard this Milligan model as illustrating all the points covered by the first claim in No. 1914. I also find, in the certified copies of letters patent granted to Charles Carlisle, on 15th May, 1847, a representation of a rake having metallic spring teeth, and a means of applying downward pressure to the teeth at the will of the operator, and that these teeth have an elasticity or spring action within themselves from their gathering points to the points at which the downward pressure is applied, except"—here is an exception that kills the whole: "except that their gathering points are made of short pieces of wood, to admit of ready repair when worn or otherwise injured." That needs no comment; that destroys itself. "I also find, in the certified copy of letters patent granted to Eli Saunders, on the 24th October, 1848, a representation and description of means for applying downward pressure, at the will of the operator, to metallic spring rake-teeth, to hold them to their work; and that the metallic rake-teeth here represented have a spring action within themselves from the gathering points to the points at which the pressure is applied.

I am, therefore, of the opinion that the said patent of Eli Saunders is a full anticipation of the invention covered by the first claim in No. 1914." Then, as regards Reed's machine: "I hold in my hands a certified duplicate of model of T. B. Reed's application, filed with the patent office on January 1, 1850, and rejected March 6, 1850, and also certified copies of the drawings and specifications. The said model has rake-teeth which are springs within themselves, and are hinged or articulated upon a common axis; it also has a pressure contrivance, under the control of the operator, by which the said teeth are held down to their work. Inasmuch as the second claim of No. 1914 does not require that the elasticity of the teeth shall extend to the point where the downward pressure is applied, I regard the invention shown and described by Reed as a substantial anticipation of that covered by the second claim in No. 1914."

Let us see, now, what this gentleman says upon the cross-examination: "Fifteenth Cross-Interrogatory. Are not the teeth in the Milligan rake attached to a bar or block, as teeth are attached to a common rake, save in the particular mode of attachment and the shape of the teeth? Answer. I decline to answer the question, because I think that the mode of attaching and the form of the teeth are of the essence of the question. * * * Seventeenth Cross-Interrogatory. Does not Milligan's model, therefore, represent, save in the mode of attaching the teeth, and their shape, and the handles, a common rake-head attached by hinges to the carriage represented? Answer. I think it does. Eighteenth Cross-Interrogatory. Is not the Milligan machine without an axle-tree or wheels, and supposed to go on runners? Answer. It is. Nineteenth Cross-Interrogatory. Is there any pressure applied on the teeth, between their insertion in the rake-head and their gathering points, in the Milligan machine? Answer. Yes; the insertion of the teeth is at the forward edge, and the downward pressure is applied through the rear edge of the flat rake-head." The difference clearly appears, there. There is no independent pressure-bar. The pressure is applied through the head of the rake. "Twentieth Cross-Interrogatory. Is not the entire pressure applied, due to the movement of the rake-head? Answer. It is. Twenty-First Interrogatory. Look at the drawing of the Carlisle patent, and say whether the teeth are not attached firmly to a head G, figure 1, and whether the handles, by which downward pressure is given to said teeth, are not also attached to said rake-head; and whether the pressure on the teeth is not due to the action of the handles on the rake-head. Answer. I answer in the affirmative. * * * Thirty-Fourth Cross-Interrogatory. Look, now, at the Landreth model, and say whether the metallic teeth there represented are not placed edgewise,

and not flatwise of the metal. Answer. They are; but their form is such as to give them considerable elasticity, and meet the requirements of flexibility and strength with the greatest economy of materials. Thirty-Fifth Cross-Interrogatory. Are you aware of any hay-rakes that have ever been built upon the Landreth model? Answer. I am not. Thirty-Sixth Cross-Interrogatory. Have you ever seen Landreth's machine in operation? Answer. I have not." Now what says the witness, Mr. Renwick? He says, in his testimony: "For the greater part of the last seventeen years I have been engaged in my present occupation" (that is, the procurement of patents), "and during that period have made numerous investigations into the history of the useful arts, as found in books and patents." He very fully describes the invention of Sabin, as set forth in the reissued patents, and is then asked, page 6: "Interrogatory. Have you examined the specification of an English patent, copied from the records of English patents, in the patent office at Washington, granted to Henry Smith, July 3, 1844, for hand and horse-rakes, and machinery for cutting vegetable substances, No. 10,241? And do you, or not, find described therein the inventions, or either of them, described and claimed in the reissued patents, or either of them, Nos. 1914 and 1915, already referred to? State particularly. Answer. I have examined what purports to be a certified patent office copy of the specification and drawing of the patent granted to Henry Smith, July 3, 1844, No. 10,241. I do not find therein the inventions described and claimed in the reissued letters patent, Nos. 1914 and 1915, nor either of said inventions." The witness goes on to state the claim and description of the Smith patent.

The conclusion to which I am led by the examination of these models, and a thorough reading of these patents, is, that none of them embrace Sabin's invention of 1850; that is, the combination shown and claimed in the reissue.

But another point made in the second defense is the want of utility. Now all that the law requires is, that the invention shall not be frivolous or dangerous. It does not require any degree of utility; it does not exact that the subject of the patent shall be better than anything invented before, or that shall come after. The invention shall not be frivolous; if it is useful at all, that suffices. Whiting v. Emmett [Case No. 17,585]; Wilbur v. Beecher [Id. 17,634]; McCormick v. Manny [Id. 8,724]; Earle v. Sawyer [Id. 4,247].

The third defense is the denial of infringement. The defendant says, in his answer, that, admitting that the invention of Sabin, in 1850, was new, original and useful, he, the defendant, has not infringed it.

To judge of that question I think it only requires an inspection of the model. Here

(in the model, "No. 3," representing the machine sold by defendant) are the pressure-bar and an elastic metallic tooth; and there are separate articulation and eye-bearings. Here, then, is the combination. The only point in which the model differs from that of Sabin's machine ("No. 2,") is that the pressure in the Sabin machine is produced by the hand of the operator, which causes the movement of the pressure-bar; whereas in the defendant's the effect is produced by the pressure of the driver's foot, or by raising the lever. But the same combination exists; the combination of the pressure-bar, the metallic spring teeth, and the separate articulation on the axis. What is the difference? Only that in the defendant's machine, the teeth articulate upon an axis placed over the axle of the moving hay-rake, the machinery to which the horse is attached, and that instead of the operator pressing the bar down or up, as the case may be, by his hand, he does it by his foot. Is that a substantial difference? What is the rule of law upon the subject?

The supreme court in Burr v. Duryee, 1 Wall. [68 U. S.] 573, lay down the rule, as it had been before declared, adopting the language of Curtis on Patents (page 333): "If the invention of the patentee be a machine, it will be infringed by a machine which incorporates in its structure and operation the substance of the invention; that is, by an arrangement of mechanism which performs the same service or produces the same effect in the same way." The effect here to be produced is the pressure to keep the teeth down to their work, and the separately articulating action by which the teeth, when meeting an obstruction presented to one alone, or to two, are enabled independently to rise over the obstacle without lifting up the rest of the teeth.

There is also a difference in another particular, viz: that in the defendant's machine the tooth, after being lifted to a certain height, strikes an obstruction, above which it can only go by all the other teeth being taken up. The teeth are thus confined; but up to that limit they play in exactly the same manner. Each tooth can rise over an obstacle, meeting it separately in the same way as in the complainant's model; and the pressure-bar is applied to the tooth in the same way—in one case by the hand of the operator, in the other by the driver; in the Sabin machine the operator walks behind and the horse is driven in front; in Pratt's model he sits on a carriage and drives and works the pressure contrivance by his foot or by his right hand, whenever he wishes to lift up the rake and drop the hay accumulated. There are two bars, one raising up the rake and the other pressing it down. But here exists the same combination, that of the metallic spring rake-tooth, having a spring in itself, from its gathering end to its connection with the axis, with a pressure-bar and

separate articulation of the teeth upon the axis, by means of which each individual tooth is lifted to meet an obstruction, and is enabled thus to take care of itself. Mr. Renwick's testimony on the subject is found on page 3: "Interrogatory. Look at the model now shown you, marked 'Frederick Pinkney, No. 3,' and say whether it exhibits, in principle and mode of operation, the invention described in Nos. 1914 and 1915 respectively, or either of them; and if yea, please describe particularly wherein the correspondence with or diversity consists. Answer. In my opinion it does. The model, 'Exhibit No. 3,' corresponds substantially with the improvement recited in the first claim of reissued letters patent No 1914, in the respect that the said model contains a pressure-frame so constructed and arranged that the operator can, by means of it, apply pressure to metallic spring rake-teeth; also, in the respect that the said model contains spring rake-teeth so constructed as to have a spring action within themselves from their gathering ends to the point where the pressure is applied, for the purpose of holding them down to their work. * * * The said model is also substantially like the improvement recited in the second claim of the said patent No. 1914, in the respect that, in addition to having a pressure-frame and spring rake-teeth, which have the peculiarities above mentioned, the rake-teeth are also jointed or articulated, independently of each other, to the frame work of the machine, so that any one rake-tooth can rise or descend by moving upon its joint, independently of and without affecting the remaining rake-teeth. The model, No. 3, contains, substantially, the improvements recited in the claim of the reissued patent, No. 1915, because it has a series of rake-teeth which are fixed in a secure manner to tubular laterally bracing and vertically supporting bearings, in such manner that the forward parts of the teeth are attached tangentially to the bearings, and are sustained directly upon the axial rod of said bearings; so that each tooth, from the point of attachment to the tubular bearings to its gathering end, is a spring." I need only refer, further, to the testimony of Mr. Knight, the defendant's expert, as found on page 58: "Thirteenth Cross-Interrogatory. Look, now, at the model of the defendant's rake, and say whether it does not comply with the claim of No. 1915 in all particulars. Answer. It does." I do not consider, upon an examination of the models and the testimony, that there exists any substantial difference between these two models; in other words, the model of the defendant, while it embraces something more, does substantially embrace, so far as it goes, the combination which was patented in reissues Nos. 1914 and 1915. I have, therefore, no doubt as to the question of infringement. I found no difficulty in arriving at this conclusion.

The fourth defense is, that Sabin's patent

had been surrendered to the public by the inventor never having made any machines or sold any rights under it. For the law upon this subject, I refer to Wyeth v. Stone [Case No. 18,107]; Stimpson v. Westchester R. Co., 4 How. [45 U. S.] 380; Battin v. Taggart, 17 How. [58 U. S.] 84. The defense charges an abandonment of the original patent. The reissued patents, unless fraud upon the patent office be proved (and it must be proved, never inferred), are prima facie evidence that there was no such abandonment. Says Judge McLean, in Battin v. Taggart, at the close of his remarks, page 85: "The jury are also to judge of the novelty of the invention, and whether the renewed patent is for the same invention as the original patent; and they are to determine whether the invention has been abandoned to the public. There are other questions of fact which come within the province of a jury, such as the identity of the machine used by the defendant with that of the plaintiffs, or whether they have been constructed and act on the same principle."

The reissued patents standing as prima facie evidence of every fact necessary to bring them within the provisions of the statute, the burden of proof is on the defendant to show an abandonment, or that any surrender to the public of the patent had taken place. There is no evidence in this case to show such surrender. There is no evidence to show that the inventor ever stood by and permitted others to make hay-rakes according to his patent without any claim or opposition. But, on the other hand, the evidence is that within two years after Mr. Sabin obtained his patent he died. That is all set forth in the application for the renewal, as is shown by the file-wrapper. Sabin was a poor man, and probably had not the means to start his invention into practical operation and set it before the public; and before he could perfect any of his machines the man died, and died, too, in indigent circumstances, as is shown by the testimony upon his widow's application. There is, therefore, nothing to show a surrender to the public of the original patent, no abandonment. An entire abandonment must be shown.

The fifth defense is that which denies that reissue No. 1915 contains any patentable novelty. I have already disposed of that question. I have no doubt that it is not open here. See Law Dig. 617; O'Reilly v. Morse, 15 How. [56 U. S.] 112; Battin v. Taggert, 17 How. [58 U. S.] 82, 83, which is a case I have before referred to as showing that that question is concluded by the action of the commissioner, after an examination.

The sixth and last defense is, that the assignment by Mrs. Sabin to Mason, Fenwick & Lawrence, when they were acting as the defendant's attorneys, inures to his benefit. I think I have disposed of that point by the examination of the question of fraud, the first defense taken. If Mason, Fenwick & Lawrence were not the defendant's general counsel, but were acting for him only for a specific purpose, and procured for him, as the evidence on both sides shows they did, all that he had a right to claim, that defense is disposed of.

A good deal has been said in the argument, and it is referred to in the answer, also, as to the course pursued by the firm of Mason, Fenwick & Lawrence, in obtaining an assignment of the rights of Mrs. Sabin, before she applied for a renewal. There is nobody here to complain of that, that has any right to complain. Mrs. Sabin is not here complaining that fraud was practiced upon her, and that she was induced to sell out her husband's right for much less than its value. The government is not here complaining that a fraud was committed upon it. It is every day's practice for a party to sell his right before he obtains his patent; and contracts of that kind have been enforced, and will be enforced. A party can sell his inchoate right to a patent; this party can, therefore, sell her inchoate right to a renewal. And in looking at the circumstances of the case, to the fact that Mr. Sabin had obtained so long ago as 1850 a patent containing a valuable principle, the value of which was discovered by these gentlemen, in Washington, and that it had lain idle and unprofitable to the widow, during all the interval, I think she ought, instead of complaining, to be very grateful that she had the expenses of the extension paid, and received five hundred dollars beside. These gentlemen had to take the risk of putting this patent in operation. They saw that the original patent was defective, that they would have to apply for reissue so that they might have granted to them, specially, what was shown by the model and drawings of Sabin, but not by his claim; and then, after obtaining the extension, and their reissued patents, they had to go through such an ordeal as we have witnessed here, where they have been assailed by ingenious counsel fully bent upon showing that their reissue was worthless, and that they got nothing by their bargain. I do not think, therefore, that Mrs. Sabin had any right to complain. But whether she had or not, she is not here to complain. The transaction, so far as the court judges from the evidence, was fair. She accepted what these gentlemen gave her, and was willing, as it appears, to take anything at all, and certainly to release, for five hundred dollars, what she did not know to be of any value whatever.

Mr. Schley. The last point, to which your honor did not refer, was that there was no assignment from Mrs. Sabin to these gentlemen.

The Court. That question is concluded and closed by the reissued patents.

Mr. Schley. The file-wrapper shows there was no assignment there.

The Court. The reissued patents recite that the patent was assigned, and therefore conclude the question, leaving open only those of fraud, and of the identity of the reissued patents with the original invention. I have examined that question. These reissued patents are prima facie evidence that they were lawfully granted, and that these parties had the right to the reissue. They furnish prima facie evidence that everything necessary to justify the commissioner in granting the reissue had been produced before the grant was made. Taking the view that I have of the case, I will issue an injunction; and if the parties ask it, I will order an account to be taken. A perpetual injunction will be granted.